# Illinois Official Reports

## Appellate Court

*People v. Jones*, 2014 IL App (3d) 121016

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTWAN L. JONES, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-12-1016 |
| Filed | November 17, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for cannabis trafficking was affirmed, notwithstanding his contentions that the State failed to prove beyond a reasonable doubt that he knew a package delivered to the home of defendant's stepmother contained cannabis and that the State's closing argument constituted plain error, where defendant picked up a package delivered by FedEx to another person's home, he took possession of the package even though it did not show his name or address, he gave the police different explanations for the situation, and reasonable inferences in favor of the prosecution's contention that defendant knew the package contained cannabis were allowable. |
| Decision Under Review | Appeal from the Circuit Court of Kankakee County, No. 12-CF-134; the Hon. Clark E. Erickson, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Sean Conley, of State Appellate Defender's Office, of Ottawa, for appellant.

Jamie J. Boyd, State's Attorney, of Kankakee (Justin A. Nicolosi, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Justices Carter and O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1    A Kankakee County jury found defendant, Antwan L. Jones, guilty of cannabis trafficking (720 ILCS 550/5.1(a) (West 2012)) and possession of cannabis with intent to deliver (720 ILCS 550/5(f) (West 2012)). Those charges stemmed from a March 8, 2012, incident in which the Kankakee Area Metropolitan Enforcement Group (KAMEG) performed a controlled delivery of a Federal Express (FedEx) package known to contain a quantity of cannabis. KAMEG agents arrested defendant shortly after he picked up and began to transport the package. The counts merged; the trial court sentenced defendant to a term of nine years' imprisonment on the trafficking count. Defendant appeals, arguing that the State failed to prove beyond a reasonable doubt that he had knowledge that the package contained cannabis. Defendant also contends that certain statements made by the State in closing arguments constituted plain error. We affirm.

¶ 2                                  FACTS
¶ 3    The State charged defendant with unlawful cannabis trafficking (720 ILCS 550/5.1(a) (West 2012)) and unlawful possession of cannabis with intent to deliver (720 ILCS 550/5(f) (West 2012)). The matter proceeded to a jury trial on July 23, 2012.

¶ 4    A security specialist for FedEx testified that the package in question met several criteria, causing FedEx to identify the package as suspicious. The criteria included the facts that the package was shipped from a southern state, paid for by cash, no signature was required, and the "ship from" phone number was the same as the "ship to" phone number. FedEx notified KAMEG and apprised it of this information. Agents of KAMEG arrived at the local FedEx facility the following day and identified the suspicious package. In addition to the factors set out by FedEx, officers noted that all of the seams on the package were taped. The officers conducted a dog sniff. After the dog alerted, agents procured a warrant to open the package. Agent Joseph Bertrand opened the package and observed what appeared to be cannabis. A field test confirmed this observation. The contents were placed back into the package along with a tracking device, and the package was resealed.

¶ 5    Agent Willie Berry delivered the package to the address listed on the package, 552 South Myrtle Avenue in Kankakee. Berry knocked on the front door and rang the doorbell at approximately 10:30 a.m. When no one answered the door, Berry put the package down and left the scene. Two minutes later, Bertrand, who was participating in the surveillance of the controlled delivery, observed a white female open the door and retrieve the package. About 13 minutes later, Bertrand saw a green and tan Buick turn down an alley adjacent to Myrtle Avenue. Two minutes after that, a black male appeared from the north side of the residence, walked up to the porch, and entered the residence.

¶ 6    Two to three minutes later, Bertrand observed the subject leaving the residence and walking in the direction of the Buick and eventually out of Bertrand's view. Other KAMEG agents were parked a few blocks away from the residence. Upon receiving a report of a green and tan Buick, the KAMEG agents followed the Buick as it left the area. The Buick turned north onto Lincoln Avenue, traveled three blocks east on Bourbonnais Street, and then turned south onto Osborn Avenue, where the agents commenced a traffic stop.

¶ 7    Defendant rode in the front passenger seat, while Latifah Starks drove. Defendant held the unopened package. When agents ordered defendant and Starks to exit the vehicle, defendant threw the package into the backseat. Agent Joseph English estimated the time between the report of the Buick's description and the traffic stop was less than two minutes. Agent Jeffrey Martin testified that the time period was "[m]aybe a minute or less." Agent Chris Kidwell testified that he initiated the traffic stop because he did not want to lose such a large amount of cannabis into the community. He estimated that the street value of the package would be approximately $38,000.

¶ 8    Agent Clayt Wolfe testified that at the time of defendant's arrest, defendant was carrying $509 in cash. Wolfe interviewed defendant following the arrest. The video recordings of that interview were entered into evidence and played in court. In the interview, defendant initially stated that he was taking the package to the post office. Later, defendant said he was taking the package to FedEx. Additionally, defendant first told police that his stepmother, Katherine Kemp, who lived at the Myrtle Avenue address, called him on the morning of March 8, informing him that a package had been delivered and that it was not for her. She asked defendant to return the package to FedEx for her. Later in the interview, defendant stated that his stepmother had called to tell him that his shoes had been delivered, but that when he arrived to retrieve the package, he noticed that it was not addressed to him. It was at this point that his stepmother suggested he bring the package back to FedEx. Wolfe testified that the Buick's direction of travel was inconsistent with defendant's claim that he was on the way to FedEx when stopped.

¶ 9    Defendant also told police that he was talking with Starks about FedEx earlier on March 8 because he was expecting a pair of shoes to be delivered. He did not want packages delivered to his own house because he did not want his girlfriend to know about them. He noted that he had a "second girlfriend" in addition to Starks. Defendant also told police that he had been in court earlier that morning regarding an issue of child support. Defendant stated repeatedly in the interview that he did not know what was in the package.

¶ 10   Katherine Kemp testified that she had resided at 552 South Myrtle Avenue since 1993. She had been in a relationship with defendant's father. Defendant called her on March 7 to inform her that he was having a pair of shoes delivered to her home. Defendant previously had packages delivered there on Christmas and Valentine's Day. Kemp never looked at who sent

the packages or to whom they were addressed, nor did she open them. Similarly, on March 8, she called defendant about the package without looking at the shipping label.

¶ 11   On cross-examination, Kemp explained that she did not "know if [the package] was shoes. [Defendant] said it was presents for his girlfriend and he didn't want her to get into them." Kemp further testified that she never told defendant the package was not addressed to him and never told defendant to return the package to FedEx.

¶ 12   Starks was the lone witness for the defense. She testified that on the morning of March 8, as she was leaving the hospital with her ill mother, she received a telephone call from defendant asking if she could pick him up. After she picked up defendant, he received a telephone call, and they proceeded to Kemp's house. Defendant went into the home and returned to the car with a package. Starks recalled that defendant had received a package of athletic apparel, delivered to Kemp's house, around Christmastime. Defendant opened that package at Starks' house, and there were Lakers hats and Michael Jordan shoes inside.

¶ 13   On cross-examination, Starks testified that she was in love with defendant and had known him for four years. In her interview with police after the traffic stop, Starks stated that she did not know defendant's full name, and simply called him "G." She did not know where defendant lived. Starks testified that she knew defendant was expecting a package that was important to him, and, for that reason, she texted defendant on the morning of March 8 when she saw a FedEx truck in the neighborhood. Starks further told police that defendant did have a car at that time, and he was working "[c]utting hair around the neighborhood." While she and defendant had discussed his filing for unemployment, she did not know whether he had.

¶ 14   Starks testified that she told defendant about the FedEx truck because defendant had previously ordered athletic apparel that had been stolen. Starks noted that in that neighborhood, packages would be stolen from porches if no one was home to accept the packages when they arrived.

¶ 15   The jury found defendant guilty on both counts. After denying defendant's motion for a new trial, the court proceeded to sentencing. The two counts merged, the court sentenced defendant only on the trafficking count.

¶ 16                                    ANALYSIS
¶ 17                          I. Sufficiency of the Evidence
¶ 18   When a challenge is made to the sufficiency of the evidence at trial, we review to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Baskerville*, 2012 IL 111056, ¶ 31. In making this determination, we review the evidence in the light most favorable to the prosecution. *Id*.

¶ 19   It is not the purpose of a reviewing court to retry a defendant. *People v. Milka*, 211 Ill. 2d 150, 178 (2004). Instead, great deference is given to the trier of fact. See, *e.g.*, *People v. Saxon*, 374 Ill. App. 3d 409, 416-17 (2007). All reasonable inferences from the record in favor of the prosecution will be allowed. *People v. Bush*, 214 Ill. 2d 318, 326 (2005). " 'Where evidence is presented and such evidence is capable of producing conflicting inferences, it is best left to the trier of fact for proper resolution.' " *Saxon*, 374 Ill. App. 3d at 416 (quoting *People v. McDonald*, 168 Ill. 2d 420, 447 (1995)). The trier of fact is not required to accept or otherwise seek out any explanations of the evidence that are consistent with a defendant's innocence; nor

is the trier of fact required to disregard any inferences that do flow from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 233 (2006); see also *Saxon*, 374 Ill. App. 3d at 416-17.

¶ 20    Section 5.1 of the Cannabis Control Act (Act) provides that "any person who knowingly brings or causes to be brought into this State *** with the intent to manufacture or deliver 2,500 grams or more of cannabis in this State or any other state or country is guilty of cannabis trafficking." 720 ILCS 550/5.1(a) (West 2012). Similarly, the Act also provides that it is unlawful for any person to knowingly possess with intent to deliver cannabis. 720 ILCS 550/5 (West 2012). Defendant was charged with one count under each of these subsections. Each offense requires the State to prove that a defendant had knowledge of the cannabis. See *People v. Schmalz*, 194 Ill. 2d 75, 81 (2000); *People v. Nwosu*, 289 Ill. App. 3d 487, 494 (1997). Defendant contends that the State failed to prove beyond a reasonable doubt that he knew the package contained cannabis.

¶ 21                                A. Proving Guilty Knowledge

¶ 22    In arguing that the facts presented at trial were not sufficient to overcome reasonable doubt with respect to the knowledge requirement, defendant cites extensively to *People v. Hodogbey*, 306 Ill. App. 3d 555 (1999). In that case, authorities seized a package of heroin en route from Thailand to Chicago. The package was addressed to the defendant, Nelson Hodogbey, and contained a note written to "Nelson." *Id*. at 556. During a controlled delivery of the package, Hodogbey looked at the return address and confirmed that the package was his. After accepting the package, Hodogbey walked "from the apartment building to the sidewalk where he looked both ways down the street before returning inside." *Id.* at 557. Hodogbey then left his apartment with a friend, at which point he was arrested. Defendant told the arresting officer that he had a friend in Bangkok, but could not remember his name. The unopened package was recovered in Hodogbey's apartment.

¶ 23    The First District found the evidence insufficient to prove beyond a reasonable doubt that Hodogbey knew the package contained heroin. *Id.* at 562. Specifically, the court stated that Hodogbey's leaving his apartment, looking up and down his street, and then returning to the apartment building was insufficient evidence, noting: " '[S]uspicious behavior in the vicinity of narcotics will not suffice as proof of knowledge as to their presence.' " *Id.* at 561 (quoting *People v. Boswell*, 19 Ill. App. 3d 619, 621 (1974)).

¶ 24    Recently, the Second District discussed the *Hodogbey* decision and its precedents. *People v. Brown*, 2012 IL App (2d) 110640. The *Brown* court pointed out that the above quotation from *Hodogbey*–"suspicious behavior in the vicinity of narcotics will not suffice as proof of knowledge as to their presence"–was taken directly from *Boswell*, 19 Ill. App. 3d at 621. *Brown*, 2012 IL App (2d) 110640, ¶ 21. The *Boswell* court, in turn, attributed the proposition to *People v. Ackerman*, 2 Ill. App. 3d 903 (1971). *Brown*, 2012 IL (App) 2d 110640, ¶ 21.

¶ 25    In *Ackerman*, the proposition appeared in the following context:

        "In *People v. Jackson*, 23 Ill. 2d 360 [(1961)], the Court declared, 'The State would have us extend the *Mack* doctrine [(*People v. Mack*, 12 Ill. 2d 151 (1957))] by holding that suspicious behavior in the vicinity of narcotics is proof not only of knowledge of their presence, but of all of the other elements of criminal possession as well. This we cannot do, however reluctant we may be to disturb the determination of the trier of facts

- 5 -

in narcotics cases.' " *Ackerman*, 2 Ill. App. 3d at 905 (quoting *Jackson*, 23 Ill. 2d at 364).

Thus, it appears that *Jackson*, the basis of the holdings in *Boswell* and *Hodogbey*, actually stands for the proposition that suspicious behavior *may* constitute proof of knowledge, but not of the other elements of the offense. *Brown*, 2012 IL App (2d) 110640, ¶ 22. Indeed, the *Jackson* court pointed out that had the element of possession been proven in that case, the evidence of the defendant's suspicious behavior "would, of course, be ample to show guilty knowledge in the defendant." *Jackson*, 23 Ill. 2d at 364.

¶ 26 We agree with the Second District that the decisions in *Hodogbey* and *Boswell* "stand for the proposition opposite to that announced in the supreme court cases from which they indirectly draw their precedential support." *Brown*, 2012 IL App (2d) 110640, ¶ 23. Because those cases depart from the precedent of our supreme court, we join the Second District in declining to follow them. A trier of fact is, indeed, entitled to draw a commonsense inference that a defendant's suspicious behavior resulted from his knowledge that he was committing a crime.

¶ 27                                    B. Defendant's Knowledge

¶ 28 "The element of knowledge is rarely susceptible of direct proof and may be established by evidence of acts, declarations or conduct of the defendant which support the inference that he knew of the existence of narcotics ***." *Nwosu*, 289 Ill. App. 3d at 494. While a trier of fact may infer knowledge from suspicious behavior, mere possession of an unopened package containing drugs is insufficient to sustain a conviction for which knowledge is an element. See *Ackerman*, 2 Ill. App. 3d at 905-06.

¶ 29 In *Ackerman*, the evidence adduced at trial showed that a package containing LSD was delivered to the defendant's dormitory. *Id.* at 904. Hours later, the defendant went to his mailbox, retrieved a notice that a package had been delivered for him, and then picked up the package. The package was addressed to Gary Lang, in care of the defendant. The defendant placed the package under his arm and began to walk toward the elevator, at which point he was stopped and arrested. The court found that there was insufficient evidence of knowledge to sustain a conviction, noting "the evidence fails to show acts, declarations or conduct which fairly support[s] any inference of knowledge by defendant that the package contained LSD." *Id.* at 905. So *Ackerman* simply and correctly held that there was no suspicious activity on the part of the defendant from which a reasonable trier of fact could infer guilty knowledge.

¶ 30 In the case at hand, numerous suspicious circumstances allow a rational trier of fact to infer that defendant had knowledge of the contents of the package. Unlike the defendant in *Ackerman*, defendant here picked up a package from another person's house. Defendant then took possession of a package that showed neither his name nor his address. It is also remarkable that in the span of approximately 18 minutes, defendant received a telephone call from Kemp, immediately directed Starks to Kemp's house (despite having his own car at the time), stayed at Kemp's for only a few minutes, then departed, ostensibly to return a wrongly delivered package to FedEx. This sort of effort, whether to obtain a pair of shoes or to return another person's package to FedEx, is suspect.

¶ 31 Also suspicious was the route that defendant traveled while in possession of the package. According to KAMEG agents, the Buick traveled briefly one block north, three blocks east,

and one block back south. At the urging of defendant, we take judicial notice of a map of the area in which defendant was traveling (see *People v. Clark*, 406 Ill. App. 3d 622, 632-34 (2010)), though this is hardly helpful to defendant's case. The map indicates that the FedEx facility, purportedly defendant's destination, was located to the northeast of defendant's location on the opposite side of the interstate. The only road in the area that appears to cross the interstate is Court Street, due north of defendant's location. Defendant was heading south at the time of his apprehension. This aligns with Wolfe's testimony that defendant's direction of travel was inconsistent with a route to the FedEx facility.

¶ 32    Further, it is probative that defendant made a series of false statements to police in his interview. As this court recognized in *Saxon*, 374 Ill. App. 3d at 417, "[f]alse exculpatory statements are ' "probative of a defendant's consciousness of guilt." ' " (quoting *Milka*, 211 Ill. 2d at 181, quoting *People v. Shaw*, 278 Ill. App. 3d 939, 951 (1996)). Defendant first told the police that he was taking the package to the post office before changing his story to the FedEx facility being his destination. He also originally told police that Kemp told him over the phone that the package was not hers and that he should return it to FedEx. Later, defendant said that he went to Kemp's house expecting that the package belonged to him and that Kemp only suggested he return the package to FedEx after he arrived at Kemp's house. Meanwhile, Kemp testified that she *never* told defendant to return the package to FedEx.

¶ 33    Defendant contends that all of these suspicious circumstances are either minor or may be explained in a way consistent with his innocence. The trier of fact, however, is not obligated to accept those explanations. *Sutherland*, 223 Ill. 2d at 233. Where reasonable inferences from the evidence may be made in favor of the prosecution, those inferences will be allowed. *Bush*, 214 Ill. 2d at 326. Due to defendant's suspicious behavior immediately before and after picking up the package, as well as his inconsistent and false statements to police, a rational trier of fact could easily infer that defendant knew that the package contained cannabis.

¶ 34                                    II. Closing Arguments

¶ 35    Defendant also argues that the State made a series of improper statements during closing arguments. Defendant identifies three specific arguments made by the State that he maintains were not based on the evidence or legitimate inferences to be drawn from the evidence. Defense counsel only objected to one of the arguments, and none were raised in defendant's posttrial motion. For that reason, defendant urges that we review under the rubric of plain error.

¶ 36    Any issue not raised in a posttrial motion is considered waived for appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). We cannot review such an issue unless it is deemed to be plain error. *People v. Rippatoe*, 408 Ill. App. 3d 1061, 1066 (2011). The first step in plain-error analysis is determining whether an error occurred at all. *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009). This error must be "clear or obvious" in order for the analysis to proceed. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Because we find no error in any of the State's arguments identified by defendant, we need not proceed to further steps in the plain-error analysis.

¶ 37    The State is afforded wide latitude in making its closing arguments. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Prosecutors are "permitted to comment on the evidence and any fair, reasonable inferences it yields." *Id*. They may not argue facts not contained on the record. *Id*. Prosecutors are also free to challenge the credibility of witnesses (*People v. Richardson*, 123

Ill. 2d 322, 356 (1988)) and the credibility of the defense's theory of the case (*Glasper*, 234 Ill. 2d at 207), as long as there is evidence to support that challenge. "Misconduct in closing argument is substantial and warrants reversal and a new trial if the improper remarks constituted a material factor in a defendant's conviction." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007).

¶ 38    Defendant first contends that the State improperly argued that Starks was aware that the package contained cannabis, pointing to the following passage from the State's closing:

> "Let's talk about Latifah Starks. The defendant's second girlfriend. Now, the person [s]he knew was expecting a package–a FedEx package specifically, and despite being at the hospital all night long with her mother who was having heart palpitations or having breathing problems, managed to an hour before the package was received and delivered text the defendant and tell him that there was a FedEx truck in the area. All this for shoes when her mother's [*sic*] at the emergency room, not knowing what's happening, she manages to text him and tell him that a FedEx package–or van is in the area–or FedEx truck is in the area. She must have known how important that package was to him, ladies and gentlemen, $38,000 of importance."

Defendant insists that the State presented no evidence that Starks had knowledge of the contents of the package and that no evidence presented could give rise to such an inference.

¶ 39    The State's implication that Starks knew the package contained cannabis was not improper. Starks was with her ill mother when she texted defendant to inform him that a FedEx truck was in the area. Though Starks testified that she did this because of the possibility of the package being stolen, the jury makes the ultimate determination of a witness's credibility. Later that day, Starks was still with her ill mother when she received a telephone call from defendant. She immediately left, picked defendant up, and drove him to Kemp's house. It is reasonable to infer from these facts that Starks was aware that the package was of great value, value beyond that of a pair of shoes.

¶ 40    Defendant next takes exception to the State's references in closing and rebuttal to defendant's financial situation. Specifically, defendant contends that it was improper for the State to infer from the evidence that defendant could not afford to buy athletic apparel or to have a large amount of cash on him. The State, defendant argues, "presented virtually no evidence of [defendant's] financial position or financial habits."

¶ 41    We, again, find that the State's argument was not improper. The State referred in its arguments to the $500 found on defendant at the time of his arrest, his owning a car, and his child support obligation. The State also referenced Starks' testimony that defendant had a job "[c]utting hair around the neighborhood." Based on the evidence of defendant's job, obligations, affinity for athletic apparel, and his having over $500 in cash, it is reasonable to infer that defendant had a source of income not mentioned by Starks. As defendant was found in possession of $38,000 worth of cannabis, the inference that he earned additional income from the sale of drugs is equally reasonable. See, *e.g.*, *People v. Johnson*, 334 Ill. App. 3d 666, 677 (2002) (large amounts of cash–$291–and drugs found on defendant sufficient to infer that defendant intended to deliver drugs).

¶ 42    Finally, defendant takes issue with the following passage from the State's rebuttal:

> "And just so we're clear, ladies and gentlemen, this case is not about shoes. There's no shoes in this case. There never were. There never will be. There probably weren't

shoes back in Valentine's Day. There probably weren't shoes back in Christmas. Shoes never existed. It's all a lie. It's a fabrication. It's a falsehood. It's the best attempt he has to cover his tracks. He used the fake names. He doesn't send the package to his house. Drug dealing 101, you insulate yourself from the conduct that you are actively participating in."

Defendant contends that, in refuting the testimony that defendant had previously received packages of shoes, the State was essentially "telling" the jury that defendant actually received shipments of cannabis.

¶ 43    We disagree with defendant's interpretation of the State's comments. By arguing that there had been no previous shipments of shoes, the State was calling into question Starks' testimony that defendant had received previous shipments of shoes and that she had witnessed him opening one such package. Essentially, the State was arguing that that testimony had been fabricated to make defendant's present explanation seem more plausible. This attack on Starks' credibility was well within the latitude given to a prosecutor in closing arguments.

¶ 44    We find that there was no misconduct on the part of the State in closing arguments, and certainly not a level of misconduct substantial enough to warrant reversal. As we find no error, we need not proceed further in our plain-error analysis.

¶ 45                                CONCLUSION
¶ 46    For the foregoing reasons, the judgment of the circuit court of Kankakee County is affirmed.

¶ 47    Affirmed.