# Illinois Official Reports

## Appellate Court

---

### *People v. Williams*, 2015 IL App (1st) 122745

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KERRY WILLIAMS, Defendant-Appellant. |
| | |
| District & No. | First District, Second Division<br>Docket No. 1-12-2745 |
| | |
| Filed | March 31, 2015 |
| Rehearing denied | April 28, 2015 |
| Modified upon<br>denial of rehearing | May 5, 2015 |
| | |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-9023(02); the Hon. Vincent M. Gaughan, Judge, presiding. |
| | |
| Judgment | Reversed and remanded. |
| | |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Emily E. Filpi, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | PRESIDING JUSTICE SIMON delivered the judgment of the court, with opinion.<br>Justices Pierce and Liu concurred in the judgment and opinion. |

# OPINION

¶ 1     This appeal concerns the limits on a prosecutor's closing argument in a criminal case. Specifically, the appeal focuses on the issue of vouching. At trial, the prosecution crossed the line of permissible argument and, therefore, we reverse.

¶ 2     BACKGROUND

¶ 3     On April 20, 2009, defendant Kerry Williams and his codefendants Michael Minnifield and Angelo Straight, all members of the Black P. Stones gang, were traveling in a vehicle that was used for a drive-by shooting. The shooting took place in an area commonly occupied by the Gangster Disciples, a rival gang. The gangs were purportedly involved in a gang war, and some of the three defendants' fellow gang members had recently been killed. Two guns were used in the drive-by shooting. One victim was killed and another sustained two gunshot wounds. All three of the vehicle's occupants, Straight, Minnifield, and defendant, were arrested for the shooting and each was charged with first degree murder and aggravated battery with a firearm. Ten months later, Straight went to the police with his attorney and agreed to plead guilty to conspiracy in exchange for testifying that defendant and Minnifield were the shooters.

¶ 4     At defendant's trial, Straight, the government's cooperating witness, testified that, at the time of the shooting, he was driving, that defendant was in the front passenger seat and Minnifield was in the backseat. Straight claimed that the three of them drove to an area looking for Gangster Disciples and when they saw a group of what appeared to be the rival gang members, Minnifield and defendant opened fire.

¶ 5     In contrast, defendant testified on his own behalf that Straight and Minnifield were the shooters. Defendant maintained that he had been drinking and smoking weed and that he was sleeping, or passed out, in the passenger seat until just before the shooting began. Defendant disclaimed any knowledge of going to look for rival gang members or of the presence of guns in the vehicle. Defendant claimed that Straight reached across him from the driver's seat to fire the shots while Minnifield was also firing from the backseat.

¶ 6     One of the people that was shot died shortly after the shooting. Another, Theodis Cook-Mims, suffered two gunshot wounds. The surviving victim turned out to be a former Gangster Disciple who identified the three occupants of the vehicle in a lineup the following day. However, in a written statement taken shortly after the shooting, the victim did not identify which two of the three were the shooters. The victim also stated that he could not definitively identify the driver. In his grand jury testimony, the victim testified that he was not paying attention to the front passenger seat and did not know if the passenger had a gun. At trial, however, the victim identified defendant as one of the shooters. The victim also conceded that he was high at the time of the shooting.

¶ 7     The physical evidence showed that all three defendants had gunshot residue on their hands. There were shell casings found both inside and outside the car in various areas. All of the shell casings that were recovered matched two guns that were eventually recovered. Cell phone tower data put both Straight and defendant near the crime scene at the time of the shooting.

¶ 8    The guns turned out to have been bought by Straight's mother in Iowa, and Straight admitted that he was a gunrunner for the Black P Stones gang. Straight did not tell the prosecutors about the origin of the guns because he wanted to protect his mother. On the day after the shooting, Straight told the officers that he was not present at the shooting, but that defendant and Minnifield had done it. Straight also told the officers that the gunshot residue on his hands was from a gun that he had touched on the previous day. Straight took the officers to a house and told them that he was at that residence at the time of the shooting. Straight abandoned all of those positions before trial and admitted that he was present at the shooting, but still maintained he was not a shooter. The evidence at trial showed that Straight had previously been shot by the Gangster Disciples, the target of the drive-by. Straight also admitted that he was facing a sentence of 90 years, but that he would serve just 7½ years in exchange for his testimony. Evidence was introduced that Straight had prior felony convictions for unlawful use of a weapon and a felony drug offense.

¶ 9    Defendant was convicted by a jury of first degree murder and aggravated battery with a firearm and sentenced to 48 years in prison. The jury also made a finding that defendant personally discharged a weapon in commission of the crime.

¶ 10    On appeal, defendant's main contention is that the prosecutor improperly vouched for Straight's credibility, thereby depriving him of a fair trial. When referring to Straight's credibility in his closing argument, the prosecutor stated:

> "When a gang member comes before us and is charged with an offense, we don't just take everything he says for truth immediately, we check it out. And that's why in January 2010 when [Straight] came over to my office and spoke to me with his attorney and I was with the gang specialist, we [took] everything he said and we checked it out.
>
> * * *
>
> We go over it and we get records from the phone companies and that's why we go over and we go to the FBI and say help us with this, tell us what happened here.
>
> * * *
>
> We corroborate. We don't just put–and take the word of anyone."

The defense objected. The trial judge ruled, "sustained as to 'we.' State, the evidence corroborates itself. You don't corroborate." The prosecutor continued: "[W]ell, I'm being more or less poignant as taking the word of Mr. Straight for no reason at all, we check it out."

¶ 11                    ANALYSIS

¶ 12    Prosecutors have wide latitude in making their closing arguments. *People v. Jones*, 2014 IL App (3d) 121016, ¶ 37. They are allowed to comment on the evidence and reasonable inferences from the evidence, including a defendant's credibility or the credibility of the defense's theory of the case. *Id*. However, prosecutors are not permitted to vouch for the credibility of a government witness nor are they permitted to use the credibility of the state's attorney's office to bolster a witness's testimony. *People v. Jackson*, 399 Ill. App. 3d 314, 318 (2010).

¶ 13    In this case, the jurors were presented with a binary choice: believe defendant or believe Straight. The physical evidence, including the shell casing evidence, was insufficient to prove the identity of the second shooter. Thus, it would be problematic if the government "vouched" for Straight by putting the state's stamp of approval on his testimony, or by putting the

credibility of the State's Attorney's office behind his testimony. As we have previously observed:

> " 'The prosecutor's vouching for the credibility of witnesses *** pose[s] two dangers: [(1)] such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and [(2)] the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.' " *People v. Townsend*, 136 Ill. App. 3d 385, 402 (1985) (quoting *United States v. Young*, 470 U.S. 1, 18-19 (1985)).

Both dangers were realized in this case.

¶ 14    The State relies primarily on *People v. Pope*, 284 Ill. App. 3d 695 (1996), to support its position that the argument was proper. In *Pope*, the prosecutor stated:

> " 'Now, [the cooperating witness] testified. And, isn't it interesting. Of course, his credibility is challenged. He has got felony convictions. We gave him a deal. There is no question about that. I'd trade a bad check writer for a baby molester any day. Isn't it interesting that his testimony as to what [d]efendant told him just happens to exactly fit with the evidence, with the physical evidence ***.' " *Id*. at 706.

There, we held that argument was not improper because it did not consist of the prosecutor expressing his personal beliefs regarding a witness's credibility nor did it invoke the integrity of the State's Attorney's office. *Id*. We explained that a prosecutor does not improperly cross the bounds regarding comments on witnesses' credibility or a defendant's theory of a case if the jury has to infer that the prosecutor is expressing personal views from his comments. *Id*. at 707.

¶ 15    Defendant relies primarily on *People v. Schaefer*, 217 Ill. App. 3d 666 (1991). In that case the prosecutor stated:

> " '[A]s State's Attorney, it is not at all uncommon that I do get people who come in and tell me lies. And I hear a lot of different versions of stories. And I think–I guess, I hope, after 5 years or so, I can kind of cut through the BS and have a way to find out who is telling the truth.
>
> * * *
>
> [The cooperating witness] is not the most stellar person in the universe but I think he told the truth.' " *Id*. at 668.

While we determined that some of the statements made by the prosecutor in that case were "arguably inferences drawn from the evidence," we found the above-quoted statements to be "clearly improper" and ultimately ordered a new trial. *Id*. at 669.

¶ 16    *Schaefer*, the case relied upon by defendant, is more instructive here than *Pope*, the case relied upon by the State, because the prosecutor in this case injected into his argument his view that Straight was telling the truth. "We don't just take everything he says for truth immediately, we check it out," "we corroborate" and "don't just *** take the word of anyone" have the purpose of conveying to the jury that the prosecutor has reason to believe the witness's testimony is true, akin to "I think he told the truth," which was found improper in *Schaefer*. The comment made in *Pope* is clearly distinguishable because in that case the prosecutor's statement was simply that the witness testified consistently with the evidence–which is clearly

- 4 -

proper argument. The argument made here was not merely a comment on the evidence that had been presented.

¶ 17     The argument here is even more problematic than the prosecutor simply injecting his opinion into the case because of the way in which the prosecutor framed his argument. The prosecutor started by stating that "[w]hen a gang member comes before us and is charged with an offense, we don't just take everything he says for truth immediately, we check it out." The message that the prosecutor sent to the jury here suggested that the State's Attorney would not put an untruthful witness on the stand. That goes even further than the prosecutor's opinion. The prosecutor explicitly told the jury that Straight's credibility had already been assessed before he took the stand. The prosecutor urged the jury to believe Straight over defendant because of the government's verification of Straight's version of events. With those comments, the testimony essentially became that of the prosecutor rather than that of the witness. See *United States v. Johnson*, 529 F.3d 493, 499 (2d Cir. 2008) (by telling the jury that information obtained in the investigation corroborated the statements of witnesses who had accused the defendant, the government improperly obscured the important distinction between argument and evidence).

¶ 18     The prosecutor's argument was also improper on account of him explicitly referencing information not presented to the jury in order to bolster Straight's credibility. The comments were not, as the State suggests, merely statements that Straight's testimony was corroborated by the evidence, such as the cell phone tower data. The prosecutor told the jury that it could, in fact, believe Straight because of some independent investigation into the veracity of Straight's story that was not based on record evidence. See *People v. Lowry*, 354 Ill. App. 3d 760, 771-72 (2004) (a prosecutor's references to "studies" to resolve discrepancies in testimony were improper when the "studies" were not in evidence). There is some implied guarantee of truthfulness derived from the prosecutor's statements that arises from something other than record evidence. The prosecutor made an impermissible implication that he knew something that the jury did not, but his implication had no evidentiary basis. See *United States v. Martinez*, 253 F.3d 251, 253-54 (6th Cir. 2001) (explaining that improper vouching can stem from an implied guarantee of truthfulness based on facts outside the record, or from comments that imply that the prosecutor has special knowledge of facts not in front of the jury).

¶ 19     Moreover, the repeated use of the term "we" in the context of "checking it out" is problematic because the term can really only be reasonably construed in this context as referring to the prosecutor personally and/or the State's Attorney's office. In fact the prosecutor intimated that the "we" he was referring to was himself and the investigating agent. The trial judge also understood the State's intended implication as evidenced by his statement in response to one of defendant's objections which was: "sustained as to 'we.' " The trial judge continued, "State, the evidence corroborates itself. You don't corroborate." Undeterred, the prosecutor finished his argument with one final suggestion that the State itself had vetted Straight's testimony for its truthfulness, stating that "as [for] taking the word of Mr. Straight for no reason at all, we check it out." The context of the term "we" does not refer to an indefinite collection of the members in the courtroom (*i.e.*, *we* can tell the witness testified truthfully because *we* saw his demeanor). It was used here as a specific reference to the actions of the State's Attorney before trial (the witness came to meet with *us* in January 2010 and *we* checked out his story). See, *e.g.*, *People v. Emerson*, 122 Ill. 2d 411, 435 (1987) (finding that a prosecutor did not vouch for a witness's credibility where the use of the word "we" included

- 5 -

jurors who saw the witness's demeanor during his testimony at trial). The statements made here backed Straight's testimony with the credibility of the government. That is universally improper. See *People v. Boling*, 2014 IL App (4th) 120634, ¶¶ 125-27.

¶ 20    The State, relying on *Pope*, contends that there are certain specific words that must be used in order for an argument to become improper vouching. The State contends that an argument is not vouching unless the prosecutor uses a phrase that begins with "I think" or "I believe," and that the prosecutor must make his approval of the witness's testimony explicit. The State quotes from *Pope*: "[W]e hold that for a prosecutor's closing argument to be improper, he must *explicitly* state that he is asserting his personal views, stating for example, 'this is my personal view.' " (Emphasis in original.) *Pope*, 284 Ill. App. 3d at 707. To the extent *Pope* stands for the proposition that vouching only crosses the line when the prosecutor uses a specific phrase to qualify his comments, we disagree. Instead, courts should use a commonsense approach to determine whether the statements convey to a reasonable juror that the prosecutor believes that a witness is credible based on the prosecutor's personal knowledge, other information not contained in record, or that the testimony is credible because it has the approval of the government.

¶ 21    Although the defense conceded at oral argument that it had not identified any case law in which the prosecutor had asserted that a cooperating witness's testimony had been vetted by the government before it was offered, case law confirms that such arguments have previously been found to be impermissible. In *Gradsky v. United States*, 373 F.2d 706, 710 (5th Cir. 1967), the prosecutor stated:

> " '[prosecutors] don't put a witness on the stand unless there appears to be some credibility, until he appears to be a truthful witness.
>
> Certainly, the government ha[d] every opportunity to check out and to judge the credibility and truthfulness of [the cooperating witnesses] in this case, and in that context, we offered you their testimony.' "

The Fifth Circuit Court of Appeals explained that "it is impossible to construe the language used by the prosecuting attorney in any way other than saying that the government had run a check on these two witnesses and had concluded on the basis of such check, obviously out of the ken of the jury, that they were speaking the truth." *Id*. The court found that the foregoing statements constituted improper vouching and reversed the convictions. *Id*. at 711; see also *State v. Marshall*, 586 A.2d 85, 167 (N.J. 1991) (although the prosecutor was free to argue that testimony of state's witness was credible, it was improper for the prosecutor to suggest that "the truthfulness of his testimony had been checked *** out" (internal quotation marks omitted)).

¶ 22    *United States v. Johnson*, 529 F.3d 493 (2d Cir. 2008), is also instructive. In *Johnson*, the government's investigating agent testified that he had "skeptically and scrupulously checked out all the information furnished by the witnesses before accepting it." *Id*. at 498. The court found the testimony to be improper and explained that the government's proffered testimony obscured the distinction between argument and evidence. *Id*. In this case, the prosecutor also referenced the role that the government's investigative agent played in skeptically checking out the witness's testimony. As in *Johnson*, framing some purported corroboration that has no basis in the record as support for a finding that Straight's testimony was credible was improper.

¶ 23    After determining that the argument was improper, however, we must address whether the comments resulted in substantial prejudice to the defendant and constituted a material factor in his conviction. *People v. Temple*, 2014 IL App (1st) 111653, ¶ 68.

¶ 24    On the question of whether defendant or Straight was the second shooter in this case, the evidence was closely balanced. All three of the defendants in the case had gunshot residue on their hands. Straight originally told police that he was not present for the shooting, and he justified the presence of gun residue on his hands as resulting from touching a weapon the previous day–both positions he later abandoned. Straight made numerous other inconsistent statements to the investigators as well. Although the State tried to impute a revenge motive to defendant, Straight had at least an equally strong motive for revenge as he had previously been shot by a Gangster Disciple, the target of the drive-by. The State never introduced any evidence that directly attributed a motive to defendant. Straight was an admitted gunrunner for the gang, and the guns that were used in the shooting actually came from him. The guns were bought across state lines by his mother. Straight hid the origin of the guns and his mother's involvement from the prosecutor with whom he was cooperating and testified that his reason for doing so was to protect his mother. Additionally, 10 months elapsed between the defendants being arrested and Straight's confession, and Straight received a much more lenient sentence than he was facing had he gone to trial. Straight admitted that he was facing a sentence of 90 years but that he would serve just 7½ years in exchange for his testimony. Both defendant and Straight are admitted gang members, have criminal backgrounds, and were under the influence of drugs and alcohol the night of the incident.

¶ 25    As for the victim that was injured and testified, he identified defendant as one of the shooters, but he did so for the first time at trial. In fact, in his grand jury testimony, the victim testified that he was not paying attention to the passenger seat and did not know if the passenger had a gun. The victim also conceded that he was high at the time of the shooting, that he was a rival gang member, and that he had a criminal background.

¶ 26    Credibility was the key to the case. Between defendant and Straight, the credibility question and thus the ultimate question of who was the second shooter was closely balanced. In cases where the evidence is closely balanced, the probability that a defendant's conviction was caused by even a minor trial error is greatly enhanced. *Mullen*, 141 Ill. 2d at 402. Because the prosecutor improperly vouched for Straight, it is possible that the jury unfairly credited Straight's testimony over defendant's testimony, or that the prosecutor's statements otherwise tipped the scales against defendant so as to deny him a fair trial. It is indeed impossible to determine whether the jury's verdict was based on the improper comments, but given the content and context of the statements and the close balance of the evidence, the improper vouching necessitates a new trial.

¶ 27    Accordingly, the trial court's judgment is reversed, defendant's convictions are vacated, and the cause is remanded for a new trial.

¶ 28    Reversed and remanded.