2021 IL App (2d) 200343-U
No. 2-20-0343
Order filed November 1, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-824 |
| TYWAN S. LOCKE, | ) ) | Honorable Mark L. Levitt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Schostok and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: The Appellate Court affirmed the defendant's conviction of felony disorderly conduct arising out of defendant's furnishing a false police report; the Appellate Court held that (1) only count I of the indictment was before the court, (2) the evidence proved defendant guilty beyond a reasonable doubt, and (3) defendant's trial counsel was not ineffective for failing to challenge the indictment where the indictment sufficiently charged the offense.

¶ 2    Defendant, Tywan S. Locke, appeals his conviction of disorderly conduct (720 ILCS 5/26-1(a)(4) (West 2018)) following a bench trial. The court sentenced defendant to 14 months' imprisonment in the Illinois Department of Corrections. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4 On June 26, 2019, a Lake County grand jury indicted defendant on two counts of felony disorderly conduct. Count I charged that, on or about December 23, 2018, defendant knowingly transmitted to Lieutenant William Rafferty, a peace officer for the Highwood Police Department, a report that defendant was struck by a vehicle, knowing that there were no reasonable grounds for believing that such offense had been committed, in violation of section 26-1(a)(4) of the Criminal Code of 2012 (Code) (720 ILCS 5/26-1(a)(4) (West 2018)). Count II alleged that defendant knowingly called 911 for the purpose of reporting false information, that being that defendant was struck by a vehicle, knowing when the call was made that (1) there were no reasonable grounds for making the call and (2) the call could result in the emergency response of any public safety agency, in violation of section 26-1(a)(6) of the Code (720 ILCS 5/26-1(a)(6) (West 2018)).

¶ 5 On February 5, 2020, the grand jury returned an amended indictment, adding counts III and IV. Count III alleged that defendant transmitted a false police report to a "peace officer," in violation of section 26-1(a)(4) of the Code, and count IV alleged that defendant transmitted, or caused to be transmitted, to the Highland Park Police or Fire Departments a false request for an ambulance, in violation of section 26-1(a)(9) of the Code (720 ILCS 5/26-1(a)(9) (West 2018)).

¶ 6 The following evidence was presented at defendant's bench trial. Officer Mike Byrne testified that he was on patrol on December 23, 2018, at approximately 1 p.m., when he spotted three individuals walking on Sheridan Road in Highwood. He recognized defendant as one of those individuals from prior encounters involving selling candy without a permit. Byrne testified that, over the past five years, the Highwood police had received calls about "kids" soliciting sales of candy without a permit. Shortly after seeing defendant and his companions on Sheridan Road, Byrne and his partner, Officer Ian Roche, approached defendant and one of the other men as they came out of Clucker's restaurant on Sheridan Road. Byrne testified that he asked to speak with

them, but they walked away from him, swearing at him. Byrne informed the men that they were not allowed to sell candy and would be issued a "citation" for doing so. Defendant responded that the officers "would have to catch him first." The second man flashed a wad of bills at Byrne. Roche told the men, "Walk on, walk on." Defendant uttered profanities at Roche, and Roche grabbed defendant's arm. Defendant accused Roche of racism and began video recording the officers with his camera. Byrne told Roche that the officers should leave because the men were not "doing anything wrong or illegal."

¶ 7    Byrne testified that he pulled his squad car onto Sheridan Road but watched as Roche got into his squad car. Byrne testified that defendant and his companion were still in the area and Byrne wanted to make sure that Roche was okay. Byrne testified that defendant was "very loud and yelling."

¶ 8    Byrne testified that defendant, cell phone in hand, moved behind Roche's rear bumper on the passenger side. Byrne saw Roche's brake lights come on as he slowly backed out of the parking space. Byrne testified that, "[a]s [Roche's] vehicle was backing out," defendant "pushed off" the squad car with his hands and "[said] that [Roche] hit him." According to Byrne, "it did not look like [defendant] had been hit by the vehicle." Byrne asked defendant if he needed anything, but defendant kept yelling at Byrne. Byrne saw Roche leave the area, and then Byrne, convinced that defendant was not injured, also left the area. According to Byrne, defendant was walking normally around the parking lot and talking as Byrne left.

¶ 9    Byrne testified that, shortly after he left Clucker's, he was notified that an ambulance had been called to a "disturbance" at Clucker's. Byrne returned there 30 seconds to a minute later. Defendant was sitting in the middle of the parking lot, and his companion was with him. Defendant and his companion told Byrne that Roche had hit defendant with his squad car. Byrne testified that

he said, "No, that didn't happen that way. You know it didn't," but the men continued to yell and swear at him, calling him names. Defendant wanted to speak with a supervisor. As Byrne was the "officer in charge," he told defendant to go to the police department to speak with a lieutenant. Byrne testified that defendant called for paramedics, but when Highland Park paramedics arrived, defendant refused to be transported to a hospital.

¶ 10    Roche testified that the three individuals walking on Sheridan Road were carrying boxes of candy when he first saw them. Roche and Byrne decided to advise them "not to engage in the sale of candy." To that end, the officers located defendant and one of his companions at Clucker's. Roche parked his squad car in the restaurant's parking lot. A busboy informed Roche that the third man had "fled" from the restaurant.

¶ 11    When Roche arrived on the scene, Byrne was conversing in a normal tone with defendant and his companion, warning them not to sell candy. Then, said Roche, things escalated. Roche testified that defendant called him a "bitch" and called Byrne a "bitch ass n***." Roche testified that he then attempted to "escort" defendant down the street. Roche touched defendant's shoulders, but defendant pulled away from him. The officers told defendant, "You have to move on, you can't sell candy." Roche told them that, if he saw them selling candy, they were going to jail. Roche considered the encounter over, and, as he walked to his squad car, he saw defendant standing behind it and then beside it. According to Roche, defendant's companion was standing "closer" to the restaurant.

¶ 12    Roche testified that he "very slowly" backed out of his space and headed away from the scene. Roche testified that he did not see defendant in his mirrors or camera as he backed up, nor did his car emit a warning that something was behind him. He testified that he pulled out of the parking lot "without incident."

¶ 13 Very shortly thereafter, Roche returned to Clucker's parking lot in response to a dispatch of a "pedestrian hit by a police vehicle." When Roche arrived, the fire department and the paramedics were there. Roche testified that defendant was uncooperative with the paramedics, while defendant's companion was yelling obscenities and waving candy in the air.

¶ 14 On cross-examination, Roche testified that he wrote in his report that both defendant and his companion were behind his squad car when he left Clucker's parking lot. Roche clarified that the companion was not as close to the squad car as defendant, who was "really close." Roche testified that, although defendant was behind his car when he reversed, defendant was not in the car's path. Roche also acknowledged that he wrote in his report that defendant's shoulder came into contact with his squad car. Roche explained that he did not see defendant throw his shoulder into the vehicle, but that was Byrne's observation.

¶ 15 At 1:18 that afternoon, defendant called 911 and gave his name as "Tysan Luke." In response to that call, 911 dispatched a Highland Park ambulance to Clucker's. Defendant complained of knee pain to the paramedics, but he refused to be transported to a hospital. He video recorded the fire department personnel and paramedics with his cell phone.

¶ 16 Defendant drove himself to Highland Park Hospital at 2:10 that afternoon. A hospital video showed him limping slightly on his left leg as he entered the hospital. As defendant walked, he bent his left knee. The video showed defendant picking out a wheelchair in the vestibule and sitting down, bending both knees and manifesting no outward signs of pain. He was later seen by Jessica Reich, a physician's assistant. Defendant told Reich that a police car backed into his left knee. He complained of pain when bending his knee. Upon physical examination of defendant's knee, Reich found no swelling, abrasions, or bruising. X-rays were also normal. Reich treated defendant's knee with ice and an Ace bandage and released defendant.

¶ 17    Defendant told Reich that he wanted to make a police report of his contact with the police vehicle. The hospital notified the Highwood police, and Lieutenant William Rafferty came to the hospital to take defendant's report. Defendant submitted a handwritten report, as follows:

> "Me and my friend was [sic] exiting a chicken place when one officer approached us saying that we will go to jail if we sale [sic] candy and his partner came up with a nasty attitude saying a lot of crazy things on how we gone [sic] go to jail and stuff like that and I was exampling [sic] to him how is we gone [sic] to go to jail if you never got a call about us selling nothing [sic] and we don't have no [sic] candy now that's when he grab [sic] my right side of my coat[,] pushed me[,] and told me to get the fuck on and I responded I don't have to and I'm requesting a white shirt.[1] They didn't call him so I called the police as I went to his car to take a picture that's when he bagged [sic] up and hit me with his squad car #6 and pulled away."

¶ 18    The State introduced into evidence a video of the occurrence, which was recorded by a camera located at a nearby business. The video showed defendant standing by the rear driver's side of Roche's vehicle as Roche entered the driver's seat. Defendant then quickly moved toward the rear passenger side of the vehicle. The camera angle was such that defendant was almost totally obscured by a stone pillar. Only a sliver of defendant's left side was visible. As Roche backed straight out of his parking space, defendant, who was directly behind Roche's vehicle, facing the bumper, took backwards steps behind the moving car, although the distance between defendant and the rear bumper is impossible to tell. In viewing the video multiple times, this court was unable to discern whether defendant and Roche's vehicle made contact. However, after Roche left the

---

[1] A "white shirt" is a police supervisor.

scene, defendant clearly remained visible, standing upright for a long period of time, in no apparent distress, until he suddenly fell to the ground.

¶ 19    After the State rested and the court denied defendant's motion for a directed finding, defendant testified in his own behalf. Defendant was 20 years old, a Chicago resident, and a GED student. He was employed at a moving company. Defendant testified that he had previous convictions for robbery and domestic battery.

¶ 20    On December 23, 2018, he and two friends went into Clucker's looking for something to eat, but the prices were "ridiculously high," so the trio left. Byrne was outside, waiting for them, and then Roche appeared. Defendant testified that both officers said that defendant and his companions were going to jail for "soliciting candy." Defendant denied that they were selling candy. He testified that they were in Highwood to meet girls at Walgreens. Defendant testified that Roche was "aggressive" and "constantly yelling," so that defendant felt unsafe.

¶ 21    Defendant testified that he refused to give the officers his name because his uncle, who shares his last name, was killed by the Chicago police. That incident resulted in a high-profile lawsuit, so defendant "didn't feel safe giving them my name because, in my mind, all officers work together." For that reason, and because he had prior tickets for soliciting the sale of candy, defendant gave the 911 dispatcher a false name.

¶ 22    Defendant testified that, when the officers told him to "move on," he interpreted that as meaning "get out of Highwood." He told the officers, "It's a free world." Defendant testified that Roche grabbed his collar and threw him to the side. Defendant then asked for a supervisor so that he could make a complaint that he was being "mistreated and harassed." When the officers did not get him a "white shirt," he called 911. While defendant was on the 911 call, he was struck by Roche's squad car. Defendant testified: "[T]he bumper tapped my knee." Defendant testified that

he did not feel safe getting into the ambulance because of the "incident that happened with my uncle." Defendant testified that he was also afraid that Byrne and Roche would get into the ambulance with him.

¶ 23    Defendant testified that he drove himself to the hospital that afternoon, where he was treated and released.

¶ 24    On cross-examination, defendant said that he knew the name of only one of his companions. He also did not know the names of any of the girls that they were supposed to meet. Defendant testified that he usually sells candy, but this time he did not. Defendant stated that the police lied about seeing candy in his and his companions' possession that day.

¶ 25    Defendant testified that he was on the 911 call when Roche began backing out of his parking space, although he did not see the car move, as he was paying attention to his phone. Defendant told the 911 dispatcher that he was going to stand behind the squad car so that Roche could not leave the area. According to defendant, by the time he was "ready to move," the squad car had already hit him in his left knee. He testified that he felt pain "right away." Defendant testified that the impact did not knock him down. He agreed that he remained standing for 23 seconds after he was struck, as shown on the video, before he sat down. Defendant also agreed that he heard his companion laughing on the video.

¶ 26    Defendant testified that numerous paramedics and firefighters responded to his 911 call. He testified that they did not ask him if he needed help. According to defendant, he could neither stand nor walk. Defendant admitted signing a form refusing their help. Defendant also admitted that he recorded the paramedics, telling them that he was going to give the video to his lawyer. Defendant testified that he "hopped" to his car and then drove himself to the hospital. On re-direct examination, defendant explained that he fell to the ground because had previously been shot in

his right leg, which would not support him after Roche backed into his left knee. Defendant rested, and the State presented no rebuttal.

¶ 27     The court found the State's witnesses to be credible. The court contrasted their testimony with defendant's, whose testimony the court described as defying "all logic," "completely incredible," and making "absolutely no sense." The court found that the State proved its case "beyond any doubt at all." The court found defendant guilty on all counts of the indictment, merged counts II through IV into count I, and entered judgment on count I. The court sentenced defendant to 14 months' incarceration, and defendant filed a timely appeal.

¶ 28                                  II. ANALYSIS

¶ 29     Defendant first contends that he was not proved guilty of disorderly conduct beyond a reasonable doubt. When a defendant challenges the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Muffick*, 2019 IL App (5th) 160388, ¶ 8. Defendant concedes that the court entered judgment on count I of the indictment and that the remaining counts merged into count I. Defendant also concedes that the effect of merger is to (1) vacate the convictions on the merged counts (*People v. Betance-Lopez*, 2015 IL App (2d) 130521, ¶ 61), and (2) relieve this court of jurisdiction to decide the validity of a defendant's unsentenced convictions (*People v. Relerford*, 2017 IL 121094, ¶ 71). Nevertheless, defendant asks us to do what our supreme court forbade in *Relerford*, that is, to decide the validity of his vacated convictions on counts II through IV. Defendant argues that this is a matter of "first impression." Indeed, it is not. Our supreme court in *Relerford* could not have been clearer that we lack jurisdiction to do so. Consequently, we address only whether defendant was proved guilty beyond a reasonable doubt of count I.

¶ 30    Count I charged that defendant knowingly transmitted to Lieutenant William Rafferty, a peace officer for the Highwood police department, a report that defendant was struck by a vehicle, knowing that there were no reasonable grounds for believing that such offense had been committed, in violation of section 26-1(a)(4) of the Code. Subsection (a)(4) of the disorderly conduct statute provides that a person commits disorderly conduct when he or she "transmits *** in any manner to any peace officer *** a report to the effect that an offense *** has been committed, knowing at the time of the transmission that there is no reasonable ground for believing that the offense *** has been committed." 720 ILCS 5/26-1(a)(4) (West 2018).

¶ 31    Defendant maintains that count I failed to allege that he reported an "offense." Defendant argues that "offense" means a violation of a criminal statute. Defendant urges that count I did not specify which criminal statute he implicated in his statement to Rafferty. Defendant wrote in his statement that Roche hit him with his squad car. At a minimum, this alleged that Roche committed a battery in violation of section 12-3 of the Code (720 ILCS 5/12-3 (West 2018)). Defendant, who was in the hospital complaining of knee pain, also stated that, after Roche struck him with his squad car, the officer left the scene. In context, this implicated section 11-401(a) of the Vehicle Code (625 ILCS 5/11-401(a) (West 2018)), which prohibits the driver of a motor vehicle involved in a personal injury accident from leaving the scene. Defendant argues that this statute is inapplicable because Roche denied that he hit defendant. However, at issue is what defendant reported, not whether the State could prove Roche guilty of the offense.

¶ 32    Next, defendant contends that he made a "citizen's complaint" about Roche's "overall conduct," rather than a "report" of a criminal offense. The State argues that defendant forfeited this argument because he did not raise it below. Mindful that a defendant cannot forfeit a challenge to the sufficiency of the evidence (*People v. Williams*, 2013 IL App (1st) 111116, ¶ 71), the State

contends that defendant's argument "surpasses" a "mere" sufficiency-of-the-evidence claim because the trial court was never asked to decide that issue. We disagree. The premise of defendant's argument is that he cannot be convicted of disorderly conduct beyond a reasonable doubt where he did not make a "report."

¶ 33   Defendant's argument that he made a civil rights complaint is belied by the record. Defendant included in his written statement that Roche harassed him about selling candy and grabbed his coat. However, the specific reason that Rafferty came to the hospital and took defendant's statement was because defendant wanted to make a police report about being struck by Roche's squad car. Upon defendant telling Reich that he had been hit by a squad car, she asked if he made a police report. Defendant said "no." Reich then "asked [defendant] if he wanted to file a police report." Reich testified: "He did."

¶ 34   Defendant argues that the disorderly conduct statute should not apply where a citizen complains to one police officer about another officer because doing so chills citizens' willingness to file complaints. However, as noted, defendant's report was not only that Roche harassed him over selling candy, but that he ran him over with his squad car. As demonstrated, that was a report of an offense that falls squarely within the disorderly conduct statute.

¶ 35    Next, defendant argues that his report was true because Roche's squad car hit him. Defendant insists that the video shows such contact, neither Byrne nor Roche were positioned to see what happened, and the video contradicts the officers' accounts of how many persons were behind Roche's squad car and whether defendant threw his arm into the squad car. Defendant argues that Byrne testified that it did not "look like" the squad car hit him. Further, defendant claims that he was in Roche's blind spot. Defendant also maintains that he was standing where

Roche's car would not emit a warning that something was behind the rear bumper. Defendant emphasizes that the court did not make any specific findings regarding what the video showed.

¶ 36    The State argues that the video shows that Byrne's view was unobstructed and that there was no contact between Roche's squad car and defendant's person, other than defendant "pushing off" the car with his hands.

¶ 37    In our viewing, the video showed that, before Roche backed out of the parking space, defendant was upright, facing the rear of Roche's vehicle. Defendant remained upright, facing the rear of the vehicle, as Roche slowly reversed. Defendant's feet moved backwards in quick, mincing steps with the car's rearward movement. However, as noted, the camera's view of defendant was mostly obscured by a stone pillar during this sequence. We are unable to conclude, from viewing the video, whether Roche's vehicle made contact with defendant's person. We note that the appellate court does not retry a defendant. *People v. Hines*, 2021 IL App (1st) 191378, ¶ 31. We will reverse a conviction only where the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Hines*, 2021 IL App (1st) 191378, ¶ 31.

¶ 38    In a bench trial, the trial court, sitting as the trier of fact, resolves conflicts in the evidence and determines the credibility of the witnesses. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). We will not reverse a conviction simply because the evidence is contradictory or where a defendant claims that a witness is not credible. *Siguenza-Brito*, 235 Ill. 2d at 228. To the extent that the video produced conflicting inferences, it is "best left to the trier of fact for proper resolution." See *People v. Jones*, 2014 IL App (3d) 121016, ¶ 19.

¶ 39    The court found Byrne and Roche credible. By contrast, the court found defendant's testimony, not only not credible, but defying all logic and making "absolutely no sense." That defendant feigned being struck by the squad car to promote a possible lawsuit against the police is

supported by his (1) baiting the officers with yelling and profanity, (2) lying to the 911 dispatcher about his name, (3) testifying that the contact between the squad car and defendant's person was negligible (defendant testified that Roche's vehicle "tapped" his knee), (4) lack of any injury, (5) refusal to be treated at the scene, (6) recording the paramedics for the stated purpose of giving the video to his lawyer, (7) driving to the hospital and selecting his own wheelchair despite his claim that he could not stand or walk, and (8) testifying repeatedly to the lawsuit brought on behalf of his uncle, who he said was shot by the police. For these reasons, we also reject defendant's argument that the evidence failed to prove that he knew that his police report was false. Accordingly, we hold that the State proved defendant guilty of disorderly conduct beyond a reasonable doubt.

¶ 40    Defendant next contends that his trial counsel was ineffective for failing to challenge count I of the indictment insofar as it failed to allege what offense defendant falsely reported. To prevail on a claim of ineffective assistance of counsel, defendant must show both that his counsel's performance was deficient and that he was prejudiced. *Strickland v. Washington*, 466 U.S. 668. 687 (1984); *People v. Murphy*, 2019 IL App (4th) 170646, ¶ 34. Where a claim of ineffective assistance of counsel was not raised in the trial court, we apply a *de novo* standard of review. *People v. Bates*, 2018 IL App (4th) 160255, ¶ 46. Here, defendant fails to demonstrate that his counsel's performance was deficient, as we have determined that count I sufficiently alleged that defendant's report that he was struck by Roche's squad car constituted either an allegation of battery or leaving the scene of a personal injury accident.

¶ 41                                III. CONCLUSION

¶ 42    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 43    Affirmed.