NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240649-U

NO. 4-24-0649

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 21, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | McLean County |
| GENO A. BORREGO, | ) | No. 22CF225 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | J. Jason Chambers, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Knecht and Cavanagh concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed defendant's convictions for two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2020)), finding the evidence was sufficient to convict, the trial court did not abuse its discretion in admitting evidence of defendant's propensity to commit sexual assault, and the prosecutor did not engage in a pattern of intentional misconduct that required reversal.

¶ 2   A McLean County jury found defendant, Geno Borrego, guilty of two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2020)). Defendant appeals his convictions, arguing (1) the evidence was insufficient to convict, (2) the trial court erroneously allowed a witness to testify to a prior, uncharged sexual assault, and (3) the State committed various acts of prosecutorial misconduct.

¶ 3   We affirm.

¶ 4                               I. BACKGROUND

¶ 5   In March 2022, the State charged defendant with two counts of the criminal sexual

assault of S.A. Count I alleged that defendant, "knowing that S.A. was unable to give consent, knowingly committed an act of sexual penetration with S.A. in that the defendant placed his penis in the vagina of S.A." Count II alleged that defendant, "knowing that S.A. was unable to give consent, knowingly committed an act of sexual penetration with S.A. in that the defendant placed his finger in the vagina of S.A." Defendant hired private counsel and pleaded not guilty.

¶ 6　　　　Defendant's first jury trial began in August 2023. A.K. testified she and defendant dated for three years, but their relationship ended before December 2021. A.K. was not asked if defendant ever sexually assaulted her, and she did not testify that he did. The jury was unable to reach a unanimous verdict, and the trial court declared a mistrial.

¶ 7　　　　Defendant's private attorney withdrew, and defendant represented himself for the remainder of the proceedings before the trial court. Before defendant's second trial, the State filed a notice of its intent to introduce testimony from A.K. that defendant sexually assaulted her in March 2019. The State provided a police report describing A.K.'s interview with police after the first trial. A.K. told police that in March 2019, defendant penetrated her with his penis, despite her repeatedly telling him to stop. She said that, when she talked to defendant about the rape, he told her that if she "really felt that way," she should break up with him. The State sought to introduce evidence of defendant's prior sexual assault at trial, arguing his assault of A.K. was similar to his assault of S.A. because both women were close to defendant's age, he had known them "for a lengthy period of time before the assault," the assaults occurred in a bedroom on a bed, and after each assault, defendant tried to prevent each woman from accusing him. Defendant moved to suppress the evidence, arguing that the two allegations were dissimilar. He also argued that in 2022, A.K. told police, "I never saw [defendant] do anything like force himself on anyone," contradicting her assault allegation.

¶ 8 On the first day of the second trial, the trial court ruled that A.K.'s testimony about the previous sexual assault was admissible. Comparing the assaults of A.K. and S.A, the court found "that there are similarities that weigh in favor of the State." It also found that less than three years passed between the assaults, so "there's not a huge amount of time between them." Finally, the court acknowledged A.K. possibly made inconsistent statements, but this did not render the testimony inadmissible, and defendant could impeach A.K.

¶ 9 During opening arguments, defendant told the jury, "I'm not going to deny the DNA found on [S.A.'s] vagina was mine, because it was." But, he argued, the State would not be able to prove beyond a reasonable doubt that his interaction with S.A. was nonconsensual.

¶ 10 S.A. testified that on December 9, 2021, she and some other students went out to celebrate the end of the semester. At the first bar, she had a couple of vodka lemonades and a couple of shots over the course of an hour or two. They went to another bar, where she met some former friends from high school, including defendant. She drank a vodka lemonade, more shots, and a "Vegas bomb." They left the bar sometime between 12:30 a.m. and 1 a.m. Someone suggested that they should go to her apartment, and she was drunk, so she agreed.

¶ 11 S.A. explained that, after they reached her apartment, "At that point, it's all really kind of flashes of memory for me." She drank hard seltzer and smoked some marijuana. She testified that she ran to the bathroom to throw up. Defendant came to the bathroom, rubbed her back, held her hair, and brought her some water. She testified that defendant carried her out of the bathroom over his shoulder and put her in bed. In her room, she felt sick, and she thought "[e]verything was spinning." Then, her roommate, Muriel Bean, helped her put on pajamas and told everyone to leave.

¶ 12 S.A. testified that her next memory was of defendant coming into her room and

pushing against her, telling her to move over. She told him to go to sleep on the couch. She testified, "After that, I remember being touched. And I'm not sure if it was like shock or all the substances, but I feel like this isn't real. Like I kind of thought I was dreaming. And I remember just kind of being rubbed and then something entering my vagina." She felt she was in a "daze," it was "like dreaming," and she felt like she "couldn't move." She explained, "I believe he was fingering my vagina, and then, after that point, he put his penis inside my vagina, and that is when I kind of came out of that shock state and turned around and realized what was really happening."

¶ 13　　　　S.A. testified that defendant jumped up, and she said, "What were you doing?" repeatedly. She told defendant, "[Y]ou were just raping me." According to S.A., defendant answered with a lot of short sentences, like "no" or "I wasn't," trying to prevent her from screaming. S.A.'s roommate came and told defendant to leave. Eventually, Bean made defendant leave the apartment and called S.A.'s parents, who came to get her. They went to the hospital to get a rape kit. S.A. was offered a toxicology test, but she refused because she did not believe she was given any "date rape drugs."

¶ 14　　　　Defendant cross-examined S.A. She testified that she started drinking around 6 p.m. Defendant asked, "Just for clarification, you drank two vodka lemonades, one green tea shot at Pub, one vodka lemonade, two green tea shots and one Vegas bomb at Killarney's and half a can of Truly seltzer at your apartment, correct?" She answered, "Something around that, yes." She also testified she took a couple of hits of marijuana.

¶ 15　　　　Muriel Bean, S.A.'s roommate, testified next. She stayed in on December 9, 2021, and she did not drink any alcohol. She explained that S.A. came home around 2 a.m. with about 10 to 15 men, and she was very drunk. Later, Bean saw S.A. in her room throwing up into a trash can, with defendant there. She went in, kicked defendant out, and dressed S.A. for bed. S.A. then

"passed out" on the bed. Bean testified she made everyone leave the apartment. At first, Wyatt Steidinger and defendant stayed, but Bean drove Steidinger home. Defendant rode with them but returned to the apartment with Bean, saying he would sleep on the couch.

¶ 16    After they returned to the apartment, Bean tried to sleep. Later, she heard "footsteps and a door open in the hallway." About 10 minutes later, she heard murmuring, then she heard S.A. say, "[D]o you realize you just raped me?" Bean immediately got up, went to S.A.'s room, and made defendant leave. At first, defendant would not leave, but she yelled and pushed him. As Bean was trying to get defendant out of the apartment, S.A.'s ex-boyfriend called her to ask what had happened.

¶ 17    On cross-examination, Bean agreed that she heard a door open and footsteps, and this could only have been S.A. coming out of her room. She estimated she got to S.A.'s room within 30 seconds or a minute of hearing S.A. say defendant raped her. On redirect, Bean confirmed that she could not tell whose footsteps were in the hall, and they might not have been S.A.'s. She assumed someone was going to the bathroom, and she did not know if S.A. came out of her room or not. On re-cross-examination, she admitted that she had told a detective she heard S.A.'s door open, then footsteps, and she thought S.A. was walking to the bathroom. Defendant asked if it could only have been S.A. leaving her room, and she answered, "Unless someone opened it from the outside." Defendant pointed out that she heard footsteps first, then the door open, and he asked if it could only have been S.A. coming out of her room, and Bean agreed. On redirect, the prosecutor asked, "Could someone have gotten to the door and opened it without you hearing them?" Bean answered, "Um, it's a possibility."

¶ 18    Joel Whittle testified he had known defendant for 14 to 15 years, and he dated S.A. in high school. The morning of December 10, 2021, defendant called, but he was not speaking,

just breathing. Eventually, defendant told him that S.A. "made the accusations." Whittle called Bean, and he heard S.A. crying in the background. Whittle called defendant back, and defendant told him nothing happened. Later, Whittle talked to defendant a third time. According to Whittle, this time defendant told him, "We did stuff. It was mutual." Whittle claimed defendant told him that he carried S.A. from the bathroom to the bedroom because she could not walk, and "he waited for her to sober up." He denied penetrating her with his penis, and he claimed he only "fingered her."

¶ 19 Whittle also provided police with his messages with defendant. Defendant had messaged him the following:

"I understand but Muriel wasn't even there and apparently [S.A.] was on too many drugs and alcohol to remember what clearly happened. She kissed me back. If she would have told me to leave then I would have. She seemed for it at first till I fingered her, then she kinda looked like she was going to sleep so I stopped and shook her and said [S.A.] do you still want to do this, and she said get out and if my goal was to rape her I would have covered her mouth or something and kept going, but instead I apologized put my pants on, and was trying to understand why she was yelling at me to get out, then Muriel came in and told me to leave so I did. Idk what a rape kit will have on it, but my penis never entered that womans body."

Whittle responded, "Bro your story changed again Lol Just stop talking." Whittle then deleted the account used for this exchange. On cross-examination, defendant asked, "Did you ever think that the reason I was withholding information from you is because you were my best friend and [S.A.] was your ex-girlfriend?" Whittle responded, "That didn't cross my mind."

¶ 20        A.K. testified she and defendant dated from October 2018 to September 2021. On December 9, 2021, she received a message from defendant with a picture of S.A. and him at a bar. Later, she received a video from defendant of him holding S.A.'s hair while she gagged over a toilet. A.K. testified that the next day, defendant messaged her that he did something he regretted. Screenshots of those messages were admitted into evidence. She asked if he "hook[ed] up" with S.A., and he replied:

> "No. I didn't even get that drunk, but she did and I brought her water and was helping her and she came on to me and we kissed and stuff, then she randomly yelled at me to get out and I did and then she told Muriel I raped her. I have no clue what to think. I would never do something like that, and I shouldn't have put myself in that position. Me and you have had our differences, but I would never force myself on anyone. I was supposed to go home with Cam, but he was fucked up on cocaine and booze and just left me there."

Defendant also texted, "Everything was mutual at first and as soon as she said get out I left. I'm not a raper. I did nothing she didn't want to do."

¶ 21        A.K. testified that in February 2022, she talked to a detective. The detective asked if defendant ever forced himself on her sexually. She testified that she did not answer truthfully because she had no proof, and she thought no one would take her seriously because she and defendant were in a relationship. The prosecutor and A.K. had the following exchange:

> "Q. In early 2019 when you were still in a relationship with the defendant, did he climb on top of you while you were telling him to stop and not to touch you?
>
> A. Yes.
>
> Q. Did he pull your pants down and penetrate your vagina with his penis?

A. Yes.

Q. Were you telling him to stop and not touch you?

A. Yes.

Q. Did that stop the defendant?

A. No.

Q. Did this all happen in your bedroom and on your bed?

A. Yes.

Q. What was his reaction when he brought the incident up with you?

A. He told me if I really believed that he did that, then I would just break up with him."

¶ 22   On cross-examination, A.K. acknowledged that she first alleged defendant assaulted her on August 11, 2023. Defendant asked why she changed her story, and she answered, "Because I said could this actually be used in court," and because she did not think anyone would believe her. Defendant asked, "What caused you to come forward with the accusation?" She answered, "My mom knew because she confided to the lawyer the last time we were here." Defendant asked if she remembered telling police, "I never saw [defendant] do anything like force himself on anyone," and she answered, "Yes." She also admitted that she previously testified under oath but had said nothing about defendant sexually assaulting her. On redirect, she confirmed that the situation with defendant was "difficult" to talk about, and she was not asked about it the last time she testified.

¶ 23   Cameron Dawson testified he had been friends with S.A. and defendant since high school. He went out with defendant on December 9, 2021, but he was the designated driver, so he was not drinking at the bars. He went to S.A.'s apartment, and about 10 other people were there.

He explained, "As [S.A.] continued drinking, she continued to get more intoxicated, continued to be social and stuff until she got to the point where she was black out drunk." He was asked, "How could you tell she was black out drunk?" and he answered, "She was throwing up a lot and eventually passed out on her bed sleeping or unconscious." Dawson heard S.A. throwing up in the bathroom, and he saw defendant carry her from the bathroom to the bedroom. Eventually, Bean told everyone to leave. Everyone left except defendant, even after Dawson tried to get him to leave, because he was defendant's ride. Defendant told Dawson that he wanted to stay to take care of S.A., and Dawson told him that was not necessary.

¶ 24　　　　On cross-examination, defendant asked if Dawson remembered defendant saying he would not leave with Dawson because Dawson was drunk and high on cocaine. Dawson denied that happened and denied ever taking cocaine. He also denied sending defendant any message that night. Defendant showed a document to Dawson and asked if it was his "Snapchat." Dawson acknowledged his name was on the page and the page was dated December 10, 2021. He also acknowledged it had a message saying that he was going to get some "Coke." But, Dawson explained, "I don't recall saying that. This looks fake to me." He added, "It looks very photoshopped, edited and fake." Dawson denied ever telling defendant he was going to get cocaine, and he denied ever using cocaine. He testified that if he ever sent a message about "Coke," it was probably "a Coke from McDonald's." He added that the document he was shown did not provide any time the message would have been sent.

¶ 25　　　　Wyatt Steidinger testified that, at S.A.'s apartment, she was "very drunk," and he could not understand her when he talked to her. He heard her throwing up, and he saw defendant in her room, holding her hair. At some point, Bean told everyone to leave. Steidinger stayed because he did not have a ride home. Eventually, Bean and defendant drove him home.

¶ 26        Sergeant Jason Hollenkamp, with the Normal Police Department, testified he collected a buccal swab from defendant. He also listened to defendant's phone calls from the McLean County Detention Center. Recordings of some of the calls were played for the jury. In one recording, defendant said, "I'll probably lose if I fight it in here," and "I can make my own evidence as to why if I'm out there, but in here I can't do nothing."

¶ 27        Randi Morris, an emergency room nurse, was qualified as an expert nurse and sexual assault nurse examiner, without objection. She testified she examined S.A. on December 10, 2021. She collected DNA evidence from S.A. This included both an internal vaginal swab and an external vulval swab. The sexual assault evidence collection kit was admitted into evidence.

¶ 28        Jennifer Aper, a forensic scientist for the Illinois State Police, was qualified as an expert in forensic examination of bodily fluids staining and DNA analysis, without objection. She explained "Y-STR" DNA testing to the jury. When asked what conclusions can be drawn from such testing, she testified:

> "I compare DNA from evidence to DNA from known standards from the individuals involved in the case. If the DNA is consistent between the known standard from the individual and the evidence, I can say that the person is included as a possible contributor. If the DNA is not consistent, then I can say that the person is excluded as a possible contributor."

When asked to explain the significance of an "association" between evidence and the DNA from a known standard, she testified:

> "When somebody is included as a possible contributor, we need to figure out a way to give what kind of weight to that. To do this, we search the profile and data base and that will tell us how many people in the population could have

contributed that profile. That will let you know how common in the population that profile is or how rare in the population that profile is."

¶ 29        Aper then detailed the results of her analysis of the DNA recovered during S.A.'s examination. She compared the DNA from the vaginal and vulval swabs to the sample collected from defendant. For the DNA on the vulval swab, she explained, "[Defendant] was included as a possible contributor of that partial haplotype," and, "that haplotype is expected to occur in approximately 1 in 1,300 White, unrelated males, 1 in 2,300 Black, unrelated males, or 1 in 1,200 Hispanic, unrelated males." For the DNA on the vaginal swab, she concluded defendant was a "possible contributor." She further explained, "This haplotype would be expected to occur in approximately 1 in 1,200 unrelated, White individuals, 1 in 1,000 Black, unrelated individuals, or 1 in 660 Hispanic, unrelated individuals." She confirmed these tests were consistent with vaginal penetration, explaining that with an "internally collected vaginal swab [she] wouldn't expect DNA to be present just from casual contact with people. So, [she] believe[d] it's most likely from some type of vaginal penetration, something that contained DNA, either a finger or penis or maybe with a sex toy that could contain male DNA." The report was admitted without objection. After her testimony, the State rested.

¶ 30        Defendant testified in the narrative. He explained that he went out that night and encountered some people from high school, including S.A. They went to her apartment, and Dawson drove. There, they played drinking games, and someone brought out marijuana, but he did not smoke anything. He testified he saw Dawson leave, and he was supposed to be defendant's ride. Defendant testified that he messaged Dawson, asking where he was, and Dawson responded that he was going to get cocaine. S.A. went to the bathroom and kneeled like she might throw up, but she never did. Defendant held her hair and brought her water. He testified Dawson came back

at some point and asked defendant if he was ready to go, but Dawson did not look like he could drive, so defendant rejected his offer for a ride.

¶ 31     Defendant further testified that S.A. got up, brushed her teeth, then exited the bathroom and went to her room. Defendant went back to the kitchen and played cards. At some point, Bean came out and told people to leave. Bean drove Steidinger home, and defendant rode with them. When they got back, he sat on the couch, and he heard a door open. He saw S.A. going from the bathroom to the bedroom. He decided to ask her for a blanket, but when he got to her room, she had left the door open. He testified that he asked for a blanket, and she said, "Come grab it." He testified that they started talking, he moved in to try to kiss her, and she kissed him back. He thought they might have sex, so he got up and shut the door. He took his shirt and pants off, and he took her pants off. Defendant testified that he rubbed her clitoris, but he denied any "penetration" with his finger. After a minute or two, she put her arm over her face, and he stopped. He asked if she wanted to continue, and she said he could just go. He got out of bed and put on his pants and shirt. S.A. was crying, defendant asked what was wrong, and she yelled at him to get out. Bean entered the room, and S.A. said defendant raped her. Defendant said that was not true, but Bean pushed him out, and he left.

¶ 32     On cross-examination, defendant denied telling Whittle that he carried S.A. to her room. The prosecutor then asked defendant about the testimony from other witnesses that contradicted his account. The following exchange took place:

> "Q. Why are you the only person saying that [S.A.] didn't get sick?
>
> A. Because I was the only one who was actually right there.
>
> Q. [S.A.] was there, and she remembers throwing up a lot.
>
> A. I don't know.

Q. Why are you the only person saying that [S.A.] didn't accuse you of raping her until after [Bean] came into the room?

A. I don't know."

¶ 33 During closing argument, the prosecutor discussed the DNA swabs. She reminded the jury that Aper, the DNA expert, testified she analyzed the swabs, and that

"DNA profile consistent with the defendant's DNA was found on both of those DNA swabs. And the lab result from that, it's People's Exhibit No. 11, it was the last of several lab reports done in this case where Jennifer Aper did the Y-STR analysis and that was submitted into evidence. You can take that back with you to the jury room. But here's a cutout of that where she had typed out basically her findings. 1B3, the internal vaginal canal swab, number of contributors, one. Because of the Y-STR you are able to exclude the female DNA from that and [defendant] is included. 1B4, the labia minora, number of contributors, one. [Defendant] included as a contributor.

Furthermore, with the DNA expert's testimony on whether or not this is consistent with penetration, remember what she said about the fact that DNA was found inside the vaginal canal. That, to her, that meant this was more than just casual contact if DNA is in the vaginal canal. And that it was consistent with a penis, a finger. She also gave the example of a sex toy that had DNA on it as well, but more than just casual contact."

The jury found defendant guilty on both counts.

¶ 34 Defendant filed a motion for a new trial, arguing that the State failed to prove him guilty beyond a reasonable doubt and the prosecutor engaged in misconduct by introducing

evidence of his assault of A.K. He also filed a motion for judgment of acquittal notwithstanding the verdict, raising similar arguments. The trial court denied defendant's motions.

¶ 35       At the sentencing hearing on March 25, 2024, S.A. read a victim impact statement. Afterwards, defendant claimed that certain information in her statement was not disclosed before trial and the State committed a *Brady* violation. See *Brady v. Maryland*, 373 U.S. 83 (1963). He once again asked the trial court to vacate the judgment or for a new trial. The prosecutor represented to the court that the State did not have this information before trial, and it provided defendant everything in the State's control. The court declined defendant's request for a new trial, reasoning the State did not commit a *Brady* violation if the information was not in its control. The court then sentenced defendant to seven and a half years' imprisonment on count I and seven years' imprisonment on count II.

¶ 36       On April 2, 2024, defendant filed a motion for a new trial, repeating his *Brady* claim from the sentencing hearing. That same day, he also filed a notice of appeal. The circuit clerk filed a notice of appeal on April 12, 2024, and defendant filed another notice of appeal on April 16, 2024.

¶ 37                                    II. ANALYSIS

¶ 38       Defendant appeals his convictions. First, he argues the evidence was insufficient to sustain either conviction. Second, he argues the trial court erred by allowing A.K. to testify that he sexually assaulted her. Finally, he argues the State committed prosecutorial misconduct by (1) asking defendant to comment on the credibility of other witnesses, (2) misrepresenting the DNA evidence during closing argument, (3) vouching for the credibility of witnesses, and (4) asking A.K. leading questions.

¶ 39                                    A. Jurisdiction

¶ 40    Before we reach defendant's arguments, we must first address the State's claim that we lack jurisdiction. Whether the appellate court has jurisdiction is a question of law, which we review *de novo*. *People v. Salem*, 2016 IL 118693, ¶ 11. Illinois Supreme Court Rule 606(a) (eff. Dec. 7, 2023) states, "Appeals shall be perfected by filing a notice of appeal with the clerk of the trial court." However, Illinois Supreme Court Rule 606(b) (eff. Dec. 7, 2023) states:

> "When a timely posttrial or postsentencing motion directed against the judgment has been filed by counsel or by defendant, if not represented by counsel, any notice of appeal filed before the entry of the order disposing of all pending postjudgment motions shall have no effect and shall be stricken by the trial court.
>
> *** This rule applies whether the timely postjudgment motion was filed before or after the date on which the notice of appeal was filed."

¶ 41    The State argues that defendant's notices of appeal were ineffective. On April 2, 2024, defendant filed both a notice of appeal and a written motion for a new trial. Defendant also filed notices of appeal on April 12, 2024, and April 16, 2024. Citing *People v. Willoughby*, 362 Ill. App. 3d 480 (2005), the State contends that the trial court never ruled on defendant's written motion for a new trial and that, under Rule 606(b), defendant's notices of appeal were ineffective. See *id.* at 482 ("[W]hen there has been no disposition of a timely posttrial motion directed against the judgment, a notice of appeal does not vest the appellate court with jurisdiction.").

¶ 42    The State is mistaken. Rule 606(b) requires the trial court to strike a defendant's notice of appeal only when the defendant files a "a *timely* posttrial or postsentencing motion directed against the judgment." (Emphasis added) Ill. S. Ct. R. 606(b) (eff. Dec. 7, 2023). Here, defendant's convictions were entered on November 15, 2023. Under section 116.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-1(b) (West 2022)), a defendant must file a

motion for a new trial within 30 days of the verdict. See *Salem*, 2016 IL 118693, ¶ 14 ("[A] motion for new trial is timely for purposes of Rule 606 if it is filed in compliance with the deadline set forth in the Code."). Defendant filed his motion for a new trial on April 2, 2024, over 30 days after the verdict. Therefore, his motion for a new trial was not timely, and Rule 606(b) did not require striking the notice of appeal. By properly filing his timely notice of appeal, defendant perfected his appeal, and this court acquired jurisdiction. See Ill. S. Ct. Rule 606(a) (eff. Dec. 7, 2023).

¶ 43                                B. Sufficiency of the Evidence

¶ 44          Defendant first claims that the State failed to prove him guilty beyond a reasonable doubt. "The due process clause of the fourteenth amendment to the United States Constitution requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). On review, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); see *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 45          The jury found defendant guilty of two counts of criminal sexual assault. The Criminal Code of 2012 provides, "A person commits criminal sexual assault if that person commits an act of sexual penetration and *** knows that the victim is unable to understand the nature of the act or is unable to give knowing consent." 720 ILCS 5/11-1.20(a)(2) (West 2020). The Criminal Code of 2012 defines "sexual penetration" as:

> "any contact, however slight, between the sex organ or anus of one person and an object or the sex organ, mouth, or anus of another person, or any intrusion, however

slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including, but not limited to, cunnilingus, fellatio, or anal penetration. Evidence of emission of semen is not required to prove sexual penetration." *Id.* § 11-0.1.

Finally, "consent" is

"a freely given agreement to the act of sexual penetration or sexual conduct in question. Lack of verbal or physical resistance or submission by the victim resulting from the use of force or threat of force by the accused shall not constitute consent. The manner of dress of the victim at the time of the offense shall not constitute consent." *Id.*

¶ 46 In count I, the State alleged that defendant, knowing S.A. was unable to consent, knowingly placed his penis in her vagina. In count II, the State alleged defendant, knowing S.A. was unable to consent, knowingly placed his finger in her vagina.

¶ 47 First, defendant argues the State failed to prove he penetrated S.A. with his finger and his penis. According to defendant, the State relied on only S.A.'s testimony and the DNA evidence to establish penetration, and defendant claims neither S.A. nor the DNA evidence carried the State's burden. S.A. admitted her recollection of the night was limited to "really kind of flashes of memory." Regarding the DNA, defendant cites *People v. Stoecker*, 2014 IL 115756, and *People v. Pike*, 2016 IL App (1st) 122626, and he claims that Y-STR testing cannot conclusively establish a suspect's DNA was present. Instead, he contends that the DNA evidence proved only that a male in defendant's paternal lineage could have contributed to the recovered DNA. Therefore, defendant argues, the evidence did not prove penetration.

¶ 48        Defendant is clearly wrong. The credible testimony of one witness is sufficient for a conviction. *People v. Swenson*, 2020 IL 124688, ¶ 36. "The weight to be given witnesses' testimony, the witnesses' credibility, and the reasonable inferences to be drawn from the evidence, are all the responsibility of the fact finder." *People v. Milka*, 211 Ill. 2d 150, 178 (2004). The jury's credibility determinations are entitled to great weight, and we will reverse a jury's verdict only "where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *People v. Smith*, 185 Ill. 2d 532, 542 (1999). Here, although S.A. admitted her memory of the night had gaps, she testified she remembered the penetration. Indeed, defendant's penetrating her with his penis shocked her into a greater state of awareness. Her testimony was clear and consistent, and the jury was entitled to believe her.

¶ 49        Moreover, the jury did not consider S.A.'s testimony in a vacuum. Instead, the jury evaluated her claim in the context of the other witnesses' testimony and defendant's alternative account of the night of the assault. The State's witnesses presented a coherent and largely consistent narrative, refuting defendant's testimony. Defendant appeared particularly attentive to S.A. throughout the night and rejected the opportunity to leave the party. Dawson testified that S.A. was so intoxicated she needed to be carried to her bed and that defendant carried her there, refuting defendant's claim that she walked to her room. Both Bean and S.A. testified that S.A. shouted defendant raped her and then Bean ran to S.A.'s room, disagreeing with defendant's claim that S.A. accused him only after Bean arrived. The State also introduced defendant's text messages, in which he stated that S.A. looked like she "was going to sleep" while he touched her and he "stopped and shook her," further supporting the State's narrative. While none of this evidence proves any penetration itself, when considering whether to believe S.A. or defendant, the

jury could properly consider the abundant evidence supporting S.A.'s account of the night over defendant's.

¶ 50       Indeed, in contrast to S.A., defendant was utterly unbelievable. Defendant claimed Dawson sent him a message stating he was using cocaine, and he asked Dawson to confirm he sent the message on cross-examination. Dawson adamantly denied this and testified he believed the proposed message was fabricated. The State later introduced defendant's recorded message suggesting he intended to fabricate evidence. The State also introduced defendant's conversations with other witnesses immediately after the assault, in which he had inconsistent accounts of what happened. The jury was entirely reasonable in crediting S.A.'s testimony instead of defendant's.

¶ 51       Furthermore, the State's DNA evidence added yet more confirmation to S.A.'s allegations. Aper testified that DNA was found in S.A.'s vaginal canal and that "[defendant] was included as a possible contributor of that partial haplotype." She explained "that haplotype is expected to occur in approximately 1 in 1,300 White, unrelated males, 1 in 2,300 Black, unrelated males, or 1 in 1,200 Hispanic, unrelated males." Even if Y-STR evidence cannot conclusively establish that this defendant is the only possible individual who could have contributed the recovered DNA, these occurrence rates prove it was highly unlikely that anyone else contributed the DNA. Moreover, because of the DNA's location, Aper explained, "I believe it's most likely from some type of vaginal penetration." The jury could consider this in determining whether defendant committed an act of penetration and in considering whose account was more credible.

¶ 52       Finally, the jury heard A.K. testify to defendant's propensity for criminal sexual assault. A.K. testified that in early 2019, defendant penetrated her vagina with his penis without her consent, despite her telling him to stop. As explained below, this evidence was properly admitted, and the jury could consider this evidence for "its bearing on any matter to which it is

relevant," including defendant's propensity to commit criminal sexual assault. 725 ILCS 5/115-7.3(b) (West 2022).

¶ 53　　　　In summary, considering S.A.'s clear and consistent testimony of the penetration, the DNA evidence indicating vaginal penetration by a male, the DNA expert's testimony concerning the prevalence of similar DNA profiles in the general population, the support other witnesses provided to S.A.'s account over defendant's, defendant's general lack of credibility, and the evidence of defendant's propensity for criminal sexual assault, viewed in the light most favorable to the State, the evidence was more than sufficient for a conviction.

¶ 54　　　　Moving to defendant's knowledge of S.A.'s inability to consent, defendant claims the State failed to prove S.A. was so intoxicated she was unable to consent. S.A. admitted she refused a toxicology test at the hospital after the assault, and the State introduced no scientific or medical evidence to prove the amount of alcohol and marijuana she consumed rendered her unable to consent. Defendant relies on *People v. Roldan*, 2015 IL App (1st) 131962, where the appellate court reversed the defendant's conviction for criminal sexual assault because the State failed to prove the victim was so drunk she was unable to consent. The court explained that the State failed to introduce "any medical evidence that [the victim] was in a blackout state as a result of her consumption of alcohol. Similarly, there was no medical evidence presented by the State regarding the physiology of alcohol consumption and how it may have been a factor in this case." *Id.* ¶ 26. Based on these two sentences, defendant equates this case with *Roldan* and urges us to reverse.

¶ 55　　　　*Roldan* is easily distinguishable. There, the alleged victim testified she, the defendant, the codefendant, and some other people were playing a drinking game. *Id.* ¶ 5. They walked to a store for supplies. *Id.* ¶ 6. The alleged victim testified that she had trouble walking to the store, and she and the defendant kissed at the store. She remembered arguing with the

codefendant but nothing else from that night. She did not remember having sex with the defendant. *Id.* ¶ 7. When witnesses found her wearing boy's pants that she had not been wearing before, they called the police. *Id.* ¶ 9. Police arrived and initially were unable to wake her. *Id.* ¶ 10. An assistant state's attorney interviewed the defendant, who told him that while they walked back from the store, the alleged victim repeatedly told him she wanted to have sex with him. Defendant reported that he refused and told her " 'she would regret it in the morning because she was drunk.' " He said she kept asking, so he agreed, and they had sex in his car. *Id.* ¶ 11. Another assistant state's attorney interviewed the codefendant, who reported that, after the group returned from the store, the alleged victim wanted to have sex with the codefendant. At first, he said no, because she had had too much to drink, but she tried to kiss him, so they had sex. *Id.* ¶ 12. Other witnesses testified the alleged victim did not appear drunk and she was responsive throughout the night. *Id.* ¶¶ 14-15.

¶ 56        The trial court found the defendant guilty of criminal sexual assault. *Id.* ¶ 16. The court stated that people can get so drunk they enter a " 'blackout state' " and they cannot remember anything. The court found that the alleged victim, who was 16 years old and "small in frame," had consumed so much alcohol that police were unable to wake her. Based on this evidence, the court found she was unable to consent, regardless of how she acted toward the defendant and codefendant, both of whom admitted knowing she was drunk before having sex with her. *Id.*

¶ 57        The appellate court reversed the defendant's conviction because the evidence was insufficient to show the defendant knew the alleged victim was unable to consent. *Id.* ¶ 20. Instead, the evidence showed that she kissed the defendant and repeatedly insisted she wanted to have sex with him. The court reasoned, even if the evidence showed she was "blacked out" later in the evening, "[t]he record contains no evidence of a 'blackout' or other behavior by [the alleged victim] at the time of her sexual encounter with defendant, which suggests that defendant should

have known that [the alleged victim] lacked the ability to give knowing consent." *Id.* ¶ 21. Without such evidence, the appellate court explained, the State failed to satisfy its burden of proof.

¶ 58      *Roldan* does not support defendant's argument. Medical evidence of the effects of alcohol can indeed be useful in proving inability to consent, and such evidence was lacking in *Roldan*. But the *Roldan* court did not rule that medical evidence is necessary in every case in which the State alleges a victim lacked the ability to consent. Instead, it considered medical evidence as one possible form of evidence relevant to the alleged victim's capacity to consent, along with, for example, her other capacities around the time of the sexual encounter or other witnesses' observations of her level of intoxication. *Id.* ¶¶ 22-23. The court concluded that the entire record was insufficient to prove the defendant knew the alleged victim was unable to consent. *Id.* ¶ 28.

¶ 59      Unlike in *Roldan*, the evidence here overwhelmingly showed not only that S.A. was too intoxicated to consent, but also that her level of intoxication was abundantly clear to the other party guests, including defendant. First, S.A. herself testified that she drank throughout the night and smoked marijuana. At some point, she felt ill, and she ran to the bathroom to throw up. She testified defendant sat with her in the bathroom, and she remembered being carried to her room. She felt dizzy, and she needed Bean's help to put on pajamas. After Bean told people to leave, S.A. remembered nothing else until defendant pushed himself on her. She testified that as he was assaulting her with his finger, she was in a "daze" and "couldn't move." She was shocked out of her daze when he penetrated her with his penis.

¶ 60      The State's other witnesses confirmed S.A.'s level of intoxication. Bean testified S.A. was "very drunk" and threw up, and she helped S.A. put on pajamas before S.A. fell asleep. Dawson described S.A. as "black out drunk." He heard her throwing up, and he saw defendant

- 22 -

carry her to her bedroom. Both Bean and Dawson testified that S.A. "passed out" in bed. Steidinger testified she was "very drunk," she was incomprehensible, and he heard her throwing up.

¶ 61          There was also clear evidence that defendant recognized S.A.'s level of intoxication. Whittle testified defendant told him that he carried S.A. to her room because she could not walk. Both Dawson and S.A. testified defendant carried her to her room from the bathroom.  In his text messages to Whittle, defendant said that S.A. "was on too many drugs and alcohol to remember what clearly happened" and, "She seemed for it at first till I fingered her, then she kinda looked like she was going to sleep so I stopped and shook her and said [S.A.] do you still want to do this."

¶ 62          Defendant raises various arguments to contest this evidence, but none are persuasive. On cross-examination, S.A. testified that she consumed around six and half to a seven and a half drinks over the course of the night and that she smoked "one or two hits" of marijuana. Defendant insists S.A. obviously could not have been as intoxicated as she claimed after consuming "only" this amount of alcohol and marijuana. Defendant never explains how he could know this, and we are not convinced. Defendant further argues that the testimonies of S.A. and the other witnesses regarding how much S.A. drank were inconsistent. We do not find this compelling. If the State's witnesses did not all agree on precisely how much S.A. consumed, they were remarkably consistent in describing S.A.'s degree of intoxication. Finally, defendant claims S.A.'s ability to tell him to leave when he first entered her room shows she was capable of giving and refusing consent. We disagree. S.A. telling defendant to leave her room hardly supports the inference that she consented to sexual activity, nor does it refute her claim to being in a "daze." Finally, as explained above, defendant's own account of the evening lacked any credibility.

Defendant's attempts to pick apart the evidence are unpersuasive, and we find the evidence was more than sufficient for the jury to reach a guilty verdict.

¶ 63                               C. Propensity Evidence

¶ 64           Next, defendant argues the trial court erred by allowing A.K. to testify to defendant's prior sexual assault. Before moving to the substance of defendant's argument, we first consider whether defendant properly preserved this claim. The State contends that defendant forfeited this claim by failing to object at trial and raise the specific arguments he now asserts on appeal in his posttrial motion. Defendant responds that an objection during the trial is not necessary when he filed both pretrial and posttrial motions and that his posttrial motion argued the matter with sufficient specificity to preserve his claim.

¶ 65           Defendant is correct. "Generally, '[t]o preserve an issue for appeal, the defendant must have raised the issue in a motion *in limine* or an objection at trial and also in a posttrial motion.' " *People v. Korzenewski*, 2012 IL App (4th) 101026, ¶ 7 (quoting *People v. Brown*, 319 Ill. App. 3d 89, 96 (2001)); see *People v. Hudson*, 157 Ill. 2d 401, 434 (1993) ("Although the State claims waiver, we find that defendant preserved this issue for review by raising it in a motion *in limine* and in his post-trial motions."). The State has cited no cases requiring objections both in a motion *in limine* and at trial. Either, along with an adequate posttrial motion, is sufficient.

¶ 66           We also find defendant's posttrial motion was specific enough to preserve his claim. Certainly, "[e]rrors which are not raised with sufficient specificity in the post-trial motion are not preserved for appellate review." *People v. Leggans*, 253 Ill. App. 3d 724, 732 (1993). But in defendant's motion for a new trial, he argued that the trial court erred by allowing A.K.'s propensity testimony. He quoted cases generally disapproving of propensity evidence, challenged the reliability of A.K.'s allegations, and specifically asserted that the court misevaluated the

probative value and prejudicial effect of the evidence. The State cites no authority to support its claim that defendant's posttrial motion was insufficiently specific. Therefore, we find defendant properly preserved this issue for appeal.

¶ 67    Generally, evidence of a defendant's past crimes is not admissible to show his propensity to commit the charged offense. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). However, section 115-7.3 of the Code provides an exception, allowing evidence of other crimes to prove a defendant's propensity to commit certain sex offenses. 725 ILCS 5/115-7.3 (West 2022); *Donoho*, 204 Ill. 2d at 176. This section provides that if a defendant is accused of criminal sexual assault,

> "evidence of the defendant's commission of another [sex offense] ***, or evidence to rebut that proof or an inference from that proof, may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant.
>
> (c) In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:
>
> > (1) the proximity in time to the charged or predicate offense;
> >
> > (2) the degree of factual similarity to the charged or predicate offense; or
> >
> > (3) other relevant facts and circumstances." 725 ILCS 5/115-7.3 (West 2022).

To be admissible under section 115-7.3, "[o]ther-crimes evidence must bear at least some threshold similarity to the charged offense, and as the factual similarities to the charged conduct increase, so too does the evidence's probative value." *People v. Adams*, 2023 IL App (2d) 220061, ¶ 70.

¶ 68 The decision to admit other-crimes evidence rests in the sound discretion of the trial court, and we review it for an abuse of discretion. *Id.* ¶ 62. The trial court abuses its discretion when its decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *Donoho*, 204 Ill. 2d at 182. Our supreme court has cautioned trial judges "to be cautious in considering the admissibility of other-crimes evidence to show propensity by engaging in a meaningful assessment of the probative value versus the prejudicial impact of the evidence." *Id.* at 186. However, a trial court's "failure to conduct a meaningful assessment on the record before admitting propensity evidence" is not necessarily reversible error. *Adams*, 2023 IL App (2d) 220061, ¶ 73. Instead, when determining whether to reverse a conviction based on other-crimes evidence,

> "we must first examine whether the trial court reasonably could have found that the probative value of the *** evidence to show defendant's criminal propensity was not substantially outweighed by its prejudicial effect. If we answer in the affirmative, then the trial court's failure to conduct a meaningful assessment would not render the ultimate admission of the *** evidence an abuse of discretion, *i.e.*, the failure to do an explicit balancing test would be harmless." *Id.* ¶ 77.

See *People v. Groel*, 2012 IL App (3d) 090595, ¶¶ 42-44; see also *People v. Boyd*, 366 Ill. App. 3d 84, 94-95 (2006).

¶ 69 Here, the trial court found A.K.'s testimony admissible. It agreed with the State's argument that the assaults of A.K. and S.A. had sufficient similarities, but it did not specify what similarities it relied upon. Less than three years passed between the assaults, which the court determined was not a "lengthy period of time." The court acknowledged A.K. possibly made inconsistent statements, which could affect her testimony's probative value. Nevertheless, after

weighing the factors, the court found the propensity evidence admissible, although it added that it would not stop defendant from impeaching A.K.

¶ 70        Defendant argues the trial court committed reversible error. First, he contends the court failed to make a " 'meaningful assessment of the evidence, on the record' " because it failed to specify which factual similarities between defendant's assault of S.A. and his assault of A.K. affected its decision (quoting *Adams*, 2023 IL App (2d) 220061, ¶ 72). Defendant further argues there were substantial factual dissimilarities between the two incidents. Specifically, S.A. was unconscious when defendant assaulted her, but A.K. was conscious, and A.K. and defendant were in a romantic relationship, but defendant and S.A. were not. Finally, defendant claims " 'other relevant facts and circumstances' " required excluding the evidence (quoting 725 ILCS 5/115-7.3(c)(3) (West 2022)). A.K. alleged defendant assaulted her only after his first jury trial ended in a hung jury. She also acknowledged that she told a detective she had never seen defendant "force himself on anyone." For these reasons, defendant contends the court abused its discretion in admitting the other-crimes evidence. Furthermore, he observes the evidence of the assault of A.K. was not admitted at the first trial, which resulted in a hung jury, and he argues this demonstrates the error was not harmless.

¶ 71        We find, even if the trial court did not conduct a "meaningful analysis" on the record, it did not abuse its discretion in admitting the other-crimes evidence, so there was no reversible error. See *Adams*, 2023 IL App (2d) 220061, ¶¶ 73, 77. Although defendant has identified differences between his assault of A.K. and his assault of S.A., the similarities were more important. Both incidents were criminal sexual assaults involving nonconsensual vaginal penetration with defendant's penis. Both women were close to defendant in age, and he knew them both. He assaulted each victim when he was alone with her in her bedroom, and, afterwards, he

discouraged each victim from viewing the interaction as an assault. Where the "evidence is not being offered under the *modus operandi* exception, 'mere general areas of similarity will suffice' to support admissibility." *Donoho*, 204 Ill. 2d at 184 (quoting *People v. Illgen*, 145 Ill. 2d 353, 373 (1991)). Such "general areas of similarity" are present here. *Id.*

¶ 72 Moreover, the circumstances of A.K.'s disclosure were not so discrediting that the trial court's decision admitting her testimony was arbitrary, fanciful, or unreasonable. See *id.* at 182. A.K. could reasonably have been reluctant to disclose the assault. She testified that she did not want to pursue prosecution and thought people would not believe her. Although she told the detective that she had not seen defendant "force himself on anyone," she did not say so under oath. Instead, when asked under oath, she testified defendant assaulted her. Furthermore, defendant had the opportunity to cross-examine A.K. and impeach her with her statement to the detective. We also observe that defendant never denied A.K.'s allegation during his own testimony.

¶ 73 Finally, we note another factor for the court to consider under section 115-7.3(c)(1) is "the proximity in time to the charged or predicate offense." 725 ILCS 5/115-7.3(c)(1) (West 2022). Defendant assaulted A.K. in early 2019, and he assaulted S.A. in December 2021. We agree with the trial court that these assaults were not separated by a "lengthy period of time." See *Donoho*, 204 Ill. 2d at 184 (finding other-crimes evidence admissible despite a 12- to 15-year gap between offenses).

¶ 74 We conclude the trial court did not abuse its discretion by admitting A.K.'s testimony, so we find no reversible error.

¶ 75        D. Prosecutorial Misconduct

¶ 76 Finally, defendant accuses the prosecutor of various misconduct. Specifically, defendant claims the prosecutor improperly (1) cross-examined him about the credibility of other

witnesses, (2) misrepresented the strength of the DNA evidence to the jury during closing arguments, (3) personally vouched for the credibility of witnesses, and (4) asked A.K. leading questions. We review whether a prosecutor's misconduct was so egregious as to warrant a new trial *de novo*. *People v. Cook*, 2018 IL App (1st) 142134, ¶ 62. Defendant acknowledges he forfeited these arguments, so he asks us to review them for plain error. Under the plain error rule, a reviewing court can consider an unpreserved error when

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967).

Defendant contends that " 'a pattern of intentional prosecutorial misconduct may so seriously undermine the integrity of judicial proceedings as to support reversal under the plain-error doctrine.' " (quoting *People v. Johnson*, 208 Ill. 2d 53, 64 (2003), citing *United States v. Young*, 470 U.S. 1, 33 n.16 (1985) (Brennan, J., concurring in part and dissenting in part, joined by Marshall and Blackmun, JJ.)). He claims that such intentional misconduct occurred here and that we should reverse under the second prong of plain error. He also refers to his arguments regarding the sufficiency of the evidence to support reversal under the first prong of plain error.

¶ 77                              1. *Commenting on Credibility*

¶ 78          Defendant argues the prosecutor improperly asked defendant about the credibility of the State's witnesses. "Under Illinois law, it is generally improper to ask one witness to comment

- 29 -

directly on the credibility of another witness." *People v. Becker*, 239 Ill. 2d 215, 236 (2010). When cross-examining defendant, the prosecutor asked him, "Why are you the only person saying that [S.A.] didn't get sick?" Defendant replied that he "was the only one who was actually right there." The prosecutor then said, "[S.A.] was there, and she remembers throwing up a lot." Defendant replied, "I don't know." The prosecutor also asked, "Why are you the only person saying that [S.A.] didn't accuse you of raping her until after [Bean] came into the room?" Defendant answered, "I don't know." Defendant contends the prosecutor improperly asked defendant to comment directly on the credibility of the other witnesses.

¶ 79 We find that the prosecutor's questions were appropriate. She did not ask defendant if the witnesses were lying or if they were honest. See *People v. Stevens*, 2018 IL App (4th) 160138, ¶¶ 45-47. She did not ask defendant if the other witnesses gave a credible or trustworthy account. See *People v. Boling*, 2014 IL App (4th) 120634, ¶¶ 120-22. Instead, she simply asked defendant if he could explain why his account of the night differed so drastically from the other witnesses. This is not the same as directly asking whether another witness was trustworthy, so we find no error.

¶ 80 *2. DNA Evidence*

¶ 81 Next, defendant claims the prosecutor misrepresented the DNA evidence during closing argument. A prosecutor may not argue facts not based on evidence in the record. *People v. Jackson*, 2012 IL App (1st) 102035, ¶ 18; see *Johnson*, 208 Ill. 2d at 115. On review, we "will reverse a jury's verdict based upon improper comments during closing arguments only if such remarks 'resulted in substantial prejudice to the defendant and constituted a material factor in his conviction.' " *Jackson*, 2012 IL App (1st) 102035, ¶ 18 (quoting *People v. Brooks*, 345 Ill. App. 3d 945, 951 (2004)).

¶ 82        Defendant argues the prosecutor's statements during closing argument misrepresented what Y-STR testing can prove. The State's DNA expert, Aper, testified defendant was a "possible contributor" to the DNA recovered from S.A.'s body. But during closing argument, the prosecutor told the jury that a "DNA profile consistent with the defendant's DNA was found on both of those DNA swabs." She also told them, "[Defendant is] included as a contributor." Defendant claims that the prosecutor engaged in misconduct by overstating the strength of the DNA evidence.

¶ 83        We find that the prosecutor fairly conveyed the witness's testimony to the jury. When the State's expert witness, Aper, testified, she explained, "If the DNA is consistent between the known standard from the individual and the evidence, I can say that the person is included as a possible contributor. If the DNA is not consistent, then I can say that the person is excluded as a possible contributor." Given this statement, the prosecutor description of the DNA recovered from S.A. as "consistent" with defendant's was perfectly appropriate.

¶ 84        The prosecutor's statement that defendant was "included as a contributor" also fairly reflected the evidence in the record. When this phrase is viewed in its context, included in the Background section above (*supra* ¶ 33), rather than in isolation, it is clear that the prosecutor was reading off Aper's lab report, which was properly admitted into evidence. The prosecutor had a section of the lab report page on her PowerPoint presentation, and she was reading off the page to the jury. The report states, "Number of contributors[16]: 1," and "Cannot be excluded (is included): [Defendant]." The report also has a footnote that says, "The number of contributors to a DNA profile/Y-STR haplotype is an assessment of the data based on interpretation guidelines." The prosecutor did not misrepresent this report by saying that the one "contributor[ ]" who was "included" was defendant.

¶ 85　　　　　Relying on *Stoecker*, 2014 IL 115756, ¶ 29, and *Pike*, 2016 IL App (1st) 122626, ¶ 40, defendant insists that Y-STR testing can prove only that a suspect "could have contributed" (emphasis omitted) to the DNA in the tested sample, but it cannot "conclusively determine" that a suspect's DNA was present. Of course, the prosecutor did not use the phrase "conclusively determine." Instead, she used precisely the same words that Aper used in her testimony and report. Moreover, the section of the report that the prosecutor showed the jury as she used the word "contributor" indicated that the relevant haplotype is expected to occur in approximately 1 in 1,300 unrelated White men, 1 in 2,300 unrelated Black men, or 1 in 1,200 unrelated Hispanic men, just as Aper testified. Where the prosecutor never said the evidence "conclusively determine[d]" the DNA was defendant's, where she used the same language to describe the evidence that the expert witness used in her testimony and her report, and where the prosecutor showed the jury the statistical probabilities of a match, we do not find the prosecutor misrepresented the evidence.

¶ 86　　　　　Finally, we note that defendant himself told the jury the DNA was his. In his opening argument, defendant told the jury, "I'm not going to deny the DNA found on her vagina was mine, because it was." Given defendant's acknowledgment that the DNA was his in his opening argument, we are entirely unconvinced that the prosecutor overstated the strength of the DNA evidence in her closing argument.

¶ 87　　　　　　　　　　　　　3. *Vouching for Witnesses*

¶ 88　　　　　Defendant also claims that the State improperly vouched for witnesses. Although prosecutors have "wide latitude" to make closing arguments, they "are not permitted to vouch for the credibility of a government witness nor are they permitted to use the credibility of the state's attorney's office to bolster a witness's testimony." *People v. Williams*, 2015 IL App (1st) 122745, ¶ 12. Here, the prosecutor told the jury, "We've presented you with witnesses who have no reason

to lie about their testimony. No reason to make something up to try to get someone who used to be a dear friend of theirs in trouble." Defendant argues these comments constituted improper vouching for the witnesses' credibility.

¶ 89    We disagree. Prosecutors "are allowed to comment on the evidence and reasonable inferences from the evidence." *Id.* The prosecutor here simply commented on the witnesses' motivation for testifying. In *Williams*, the prosecutor told the jury, " 'When a gang member comes before us and is charged with an offense, we don't just take everything he says for truth immediately, we check it out.' " *Id.* ¶ 10 The prosecutor added, " 'We go over it and we get records,' " and " 'We corroborate. We don't just put—and take the word of anyone.' " *Id.* The appellate court found this was misconduct because the prosecutor injected his own opinion into the matter, "suggested that the State's Attorney would not put an untruthful witness on the stand," indicated the government had verified the witness's testimony, and referred to information outside the record. *Id.* ¶¶ 17-19. The prosecutor here made no such personal assurances or guarantees of the witnesses' testimony, so we find no misconduct.

¶ 90                              4. *Leading Questions*

¶ 91    Finally, defendant claims the prosecutor improperly led A.K. when asking about the prior sexual assault. The prosecutor asked A.K. the following:

> "Q. In early 2019 when you were still in a relationship with the defendant, did he climb on top of you while you were telling him to stop and not to touch you?
>
> A. Yes.
>
> Q. Did he pull your pants down and penetrate your vagina with his penis?
>
> A. Yes.
>
> Q. Were you telling him to stop and not touch you?

A. Yes.

Q. Did that stop the defendant?

A. No.

Q. Did this all happen in your bedroom and on your bed?

A. Yes.

Q. What was his reaction when he brought the incident up with you?

A. He told me if I really believed that he did that, then I would just break up with him."

¶ 92    Generally, it is improper for an attorney to ask a leading question of her own witness. *People v. Culbreath*, 343 Ill. App. 3d 998, 1004 (2003) (citing M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 611.9, at 505 (7th ed. 1999)). "Leading questions, to be incompetent, must refer to material matters, and occur where no necessity for them appears." *People v. Schladweiler*, 315 Ill. 553, 556 (1925). "Questions that may be answered 'yes' or 'no' are generally considered leading." *People v. Bunning*, 298 Ill. App. 3d 725, 732 (1998) (citing M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 611.9, at 451 (6th ed. 1994)). "A reviewing court will not reverse a conviction because the trial court permitted the use of leading questions unless it appears both that the trial court abused its discretion and that such abuse resulted in substantial injury to the defendant." *People v. Taylor*, 132 Ill. App. 2d 473, 484 (1971). Defendant contends the prosecutor improperly led A.K. when asking about the sexual assault.

¶ 93    The State responds that the questions were appropriate. It contends that a prosecutor may direct a witness's attention to the subject matter of inquiry (see *Schladweiler*, 315 Ill. at 556) and that a question is not leading unless it suggests an answer (see *Betts v. Manville Personal Injury Settlement Trust*, 225 Ill. App. 3d 882, 905 (1992)), so the prosecutor's questions were not

leading. Alternatively, citing a case from Rhode Island, the State argues that leading questions may be permissible when eliciting necessary facts from an emotionally distraught witness. See *State v. Boillard*, 789 A.2d 881, 887 (R.I. 2002). The State suggests that A.K. might have been emotionally distressed when discussing the sexual assault and that leading questions were allowed.

¶ 94       Even if the prosecutor asked a few leading questions, those questions, on their own, would not amount to plain error. Indeed, defendant does not argue that these leading questions, alone, constituted an error "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 48. Instead, defendant argues only that a " 'pattern of intentional prosecutorial misconduct' " constituted second prong plain error (quoting *Johnson*, 208 Ill. 2d at 64 (citing *United States v. Young*, 470 U.S. at 33 n.16 (Brennan, J., concurring in part and dissenting in part, joined by Marshall and Blackmun, JJ.)). We find at most one error, and certainly no "pattern of intentional prosecutorial misconduct" (*id.*), so we reject this argument.

¶ 95       Defendant also asserts that the evidence was closely balanced, and he asks us to reverse under the first prong of the plain error doctrine. See *Sebby*, 2017 IL 119445, ¶ 48. He does not argue this point, except by referring to his argument regarding the sufficiency of the evidence. We likewise refer to our section above rejecting that argument (*supra* ¶¶ 44-62). The evidence was not remotely closely balanced. Every witness besides defendant supported the State's account and contradicted defendant's, and defendant was thoroughly discredited. We find no plain error.

¶ 96                                    III. CONCLUSION

¶ 97       For the reasons stated, we affirm the trial court's judgment.

¶ 98       Affirmed.